[No. B096769. Second Dist., Div. Seven. Nov. 19, 1996.]

PHILIP HELLER, Plaintiff and Appellant, v.
PILLSBURY MADISON & SUTRO et al., Defendants and Respondents.

COUNSEL

Jerold Fagelbaum for Plaintiff and Appellant.

Latham & Watkins, Robert A. Long and Deborah A. Bigbee for Defendants and Respondents.

OPINION

**WOODS, J.**—Plaintiff Philip Heller appeals from the postjudgment order awarding costs, and the judgment entered for defendant law firm Pillsbury Madison & Sutro and individual defendants, Pillsbury partners T. Neal McNamara, Charles Patterson, Walter Stafford and Rodney Peck. Heller had filed the instant action as a result of his expulsion from the Pillsbury firm. Heller contests the preliminary court hearing where the court found the law firm's 1992 partnership agreement, providing for expulsion of partners, fully integrated and binding on Heller. He also challenges the trial court's nonsuit on four of his causes of action and the judgment under Code of Civil Procedure section 630, subdivision (f) following a mistrial resulting from a deadlocked jury on the remaining cause of action before the jury. Heller additionally contests the trial court's dismissal of his accounting cause of action.

### FACTUAL BACKGROUND

In January 1990, Heller joined the Pillsbury Madison & Sutro law firm as a lateral partner in the firm's Los Angeles office. This San Francisco firm had some 225 partners. Soon thereafter, Heller signed the firm's 1990 partnership agreement.

Either immediately or soon after Heller became a Pillsbury partner, he brought in CB Commercial and the musical group New Kids on the Block as

new clients. Defendant Stafford, the managing partner of Pillsbury's Los Angeles office in 1990, received billing credit for Pillsbury's legal work for CB Commercial.

A year later, in January 1991, Pillsbury merged with the Lillick & McHose law firm. This merger agreement was incorporated into the 1991 partnership agreement which Heller signed.

The next month, in February of 1991, Heller appeared in the Los Angeles magazine in an article entitled *Why L.A. Men Won't Commit.* The article described Heller as an attorney at Pillsbury, included a photograph of Heller leaning against the Porsche car he owned at the time, and quoted Heller as stating that he dates " 'an embarrassing number of women.' "

That same month, on February 14, Heller met Edward Stead, vice-president and general counsel of Apple Computer, Inc. At the time, Heller knew that Pillsbury partner Barbara Creed was doing some work for Apple. Heller later learned that Creed was the billing attorney for the work she did for Apple.

As of February or March 1991, Heller periodically sent Stead letters which he copied to Creed. Later in the year, in a letter dated December 9, Heller sent Stead an outline of a proposal for the Pillsbury firm to handle Apple's employment law cases. Heller did not send Creed a copy of his proposal. A few days later, in a letter dated December 16, Creed sent Denise Rocha, chief counsel of human resources at Apple, a different proposal for Pillsbury to represent Apple in employment matters.

Upon receiving a copy of the proposal prepared by Creed, Heller told Stead to discard Heller's letter dated December 9.

Apple decided not to have Pillsbury do its legal work, because of what looked like a lack of coordination at Pillsbury and because the Pillsbury partners appeared to be disorganized.

Meanwhile, in 1991, Heller met with Jack Douglas, the general counsel of the Reebok company known for making athletic shoes. Douglas offered Pillsbury through Heller legal work, and informed Heller there was a prior case involving an opposing party represented by the Lillick firm now merged with Pillsbury. After Heller met with Douglas, he spoke with attorney Amy Hogue, who had handled the prior case. Hogue initially told Heller that the prior case was over and that there would be no problem doing work for

Reebok. Later, however, Hogue said there was a conflict of interest in that Hogue did some work for Reebok's insurer Seaboard Surety.

In a letter dated October 25, 1991, Reebok's attorney John Mitchell stated that Douglas asked Mitchell to send Heller materials for a possible lawsuit against Reebok's insurers, including Seaboard Surety, to recover expenses related to a patent infringement action. Although the materials Mitchell sent Heller included Reebok's claim against Seaboard, Heller did not try to determine if Seaboard's name was run through Pillsbury's computer system to check for possible conflicts of interest. Heller only learned of the conflict when Hogue later called and told him that she did some work for Seaboard.

In April 1991, Heller met with Stafford regarding Heller's billable hours. At the time, Stafford was still managing partner of Pillsbury's Los Angeles office. After the meeting, Stafford sent Heller a copy of a memorandum dated April 16, 1991, which Stafford prepared for McNamara, chairman of the firm's executive committee. The memorandum stated that if Heller did not produce at least 1,800 billable hours by the end of the year, and if he did not generate new business, then the law firm would ask Heller "to leave or take a reduction in points."

According to the firm's time analysis report dated December 31, 1991, by early 1991, Heller was working at a pace that annualized to about 1,200 billable hours, which was about 1,000 hours less than Heller estimated he would produce. In addition, only $230,522 of his total $368,715 in billings for 1991 was actually collected.[1]

John Hansen, a Pillsbury partner and member of the firm's compensation committee, interviewed Heller in 1991. After the interview, Hansen told Heller on December 6, 1991, that Heller was being reduced in partner points for 1992. Hansen explained that Heller's performance, including low billable hours for 1991, declined. Hansen also told Heller that the compensation committee was concerned about the decrease in Heller's collections and the quality of his work.

On February 24, 1992, Heller signed the 1992 partnership agreement. He had the opportunity to review the agreement before he signed it.

The 1992 agreement provided that the law firm's "Executive Committee" "shall be the policy making and governing authority of the Firm." The agreement authorized the Executive Committee to expel partners.

[1]Therefore, $138,193 or about 37 percent of Heller's 1991 billings was not collected. However, Pillsbury's billing records do not show any billings for clients CB Commercial, Reebok International Ltd., Cameron & Colby, Imperial Bank and Goldberg Gumerove & Co.

In a letter dated May 21, 1992, and addressed to Michael Halloran,[2] executive vice-president and general counsel of Bank of Amercia, Heller wrote that Halloran's picture in the American Lawyer magazine "is almost a caricature of what Michael Lewis described in Liar's Poker [sic] as 'One big swinging dick.' " A copy of this letter was sent to the bank's chief executive officer, Richard Rosenberg. At the time of the letter, Bank of America was one of Pillsbury's most important clients, generating between $6 million to $8 million in annual revenue.

On May 27, 1992, Heller sent Halloran a printed piece of material entitled "Why I Fired My Secretary." This material described a husband who agrees to go to his secretary's apartment and who disrobes, only to find his wife and children there.

According to David Grimes, director of administration of Bank of America's legal department, Grimes called Peck, a member of Pillsbury's Executive Committee, and asked that no more letters be sent to Rosenberg. Grimes made the call at Halloran's request. Grimes believed that if Heller's letters did not stop, Bank of America would no longer use Pillsbury's legal services.

Peck then on June 1 spoke with Heller. Peck asked Heller about any other correspondence sent to Bank of America, but Heller did not tell Peck about the May 27, 1992, mailing. Peck also instructed Heller not to communicate with Bank of America without coordinating with Peck first. Heller asked Peck whether Heller should apologize to Halloran or Rosenberg, and Peck replied in the negative.[3]

Peck subsequently, on June 1 or 2, told McNamara that Heller sent the letter dated May 21, 1992. Peck said the letter upset Halloran and Rosenberg.

Contrary to Peck's instructions and without first informing Peck or sending him a copy, Heller sent Rosenberg an apology letter dated June 2, 1992.

At the Executive Committee's June 9, 1992, meeting, the committee approved termination of Heller as a partner of the firm. McNamara, Peck and other committee members, including defendant Patterson, attended the meeting. According to McNamara, the Executive Committee discussed Bank of America, Apple, Reebok, Heller's performance and the Los Angeles magazine article.

---

[2]Halloran was formally a Pillsbury partner working out of the firm's San Francisco office.

[3]Heller's testimony at trial differs from Peck's testimony regarding the June 1 conversation. Heller testified that Peck did not tell Heller to stop communications with Bank of America.

The next day, on June 10, Grimes telephoned Peck to inform him about the May 27 and June 2 mailings from Heller. Grimes warned that if Bank of America received one more letter, it would take Pillsbury off its approved list of outside counsel.

That same day, Peck left a message for McNamara about Grimes's call, stating that Bank of America was "in an uproar" over Heller's correspondence and that Halloran threatened to not give work to Pillsbury if the firm did not do something about its "loose cannon." Peck stated that he thought Heller needed to be removed promptly "to eliminate any prospect that in some apparently authorized way he can act on behalf of the firm. I think he needs to be told that we will sue his ass or do something bad to him if he tampers with our client relationships further in the manner in which he has done."

On June 11, 1992, McNamara telephoned Heller while he was returning to the office from a deposition. McNamara told Heller to come to an office conference room. McNamara and Patterson met privately with Heller. During the meeting, Peck was called, and he participated in the meeting on a speaker telephone. McNamara told Heller that if he did not resign from Pillsbury, Heller would be expelled. Heller refused to resign, and so was expelled from the firm.

After Heller was expelled, Pillsbury changed the message on Heller's voice mail. The new message stated that Heller was no longer with the firm, that clients should speak to Patterson, and that other callers could reach Heller at home. The new message included Heller's home telephone number.

On June 16, 1992, the firm changed Heller's voice mail message pursuant to his request that same day.

After Heller's departure, McNamara asked all Pillsbury partners to be discreet and not to pass on rumors. McNamara requested a legal newspaper reporter not to print an article on Heller's departure, and no story was printed. All inquiries from persons outside the firm, as well as inside, were to be directed to Patterson so that there would be only one source. However, Patterson knew of at least one occasion where he was asked to allow other partners to talk to a prospective employer of Heller, and Patterson allowed those partners to talk to the prospective employer. Patterson also knew of two times when a prospective employer of Heller spoke to Pillsbury partners whom Heller used as references.

In the summer of 1992, a Michael Choppin asked Heller to do legal work for IDM, a corporation which started having business relations with Heller

while he was at Pillsbury. Heller was unable to accept the work. As a result, he lost $2 million in legal fees from IDM.

Following Heller's expulsion, he looked for a position as a partner at other law firms. After prospective employers indicated they would contact Pillsbury or knew particular attorneys affiliated with Pillsbury, Heller was not offered employment. According to Heller, when he contacted the law firm Keck, Mahin & Kate, which had previously offered him a position as a partner in 1989, Heller was told, "The people at Pillsbury are saying bad things about you."

In October 1992, Patterson received a telephone call from a Michael Madda of the Baker & McKenzie law firm, which began interviewing Heller in the summer. Madda asked whether Heller was still a Pillsbury partner, and Patterson replied that he was not. Patterson told Madda that the firm was discussing with Heller the terms of his departure, and that to be fair to both sides, Patterson did not think he could comment further. Patterson did not tell Madda that Heller was expelled. Madda also spoke to Pillsbury partner Jerry English, whom Heller received permission to use as a job reference.

Afterward, on November 6, 1992, Baker & McKenzie sent Heller a draft offer letter containing the terms of a draft lateral partner contract.

Madda told Heller that English sounded as though he were programmed, that Patterson had "stonewalled" Madda, and that Madda's conversations with Patterson were very uncomfortable. Baker & McKenzie did not offer Heller a position with the firm.

In 1993, Attorney Raymond Riley interviewed Heller for a partner position at a law firm then called Phillips, Nizer, Benjamin, Krim & Riley. Heller told Riley that he was on leave from Pillsbury to work on President Clinton's campaign for the office of United States President, and that Heller later decided not to return to Pillsbury. Riley did not call Pillsbury to verify Heller's statements. Heller joined the Phillips firm in May 1993.

PROCEDURAL BACKGROUND

On June 10, 1993, Heller filed a complaint against the Pillsbury law firm, McNamara, Patterson and Stafford in response to his expulsion from the firm. Following defendants' demurrer to the complaint, Heller filed on October 7, 1993, a first amended complaint adding Peck as a defendant. This complaint asserted six causes of action: breach of contract, breach of implied-in-law contract, breach of fiduciary duty, intentional interference with

prospective economic advantage, intentional infliction of emotional distress, and an accounting.

On November 5, 1993, all five defendants answered Heller's first amended complaint.

Defendants later moved for summary judgment or alternatively summary adjudication of issues. On December 28, 1994, Superior Court Judge Stephen Lachs held a hearing on the motion. Judge Lachs denied the motion, finding that "a trier of fact should be left to determine whether the power to expel was inadvertently left out of the partnership agreement or was never meant to be an express power of the committee."

On March 27, 1995, Heller's counsel paid the fee required when a party demands a jury trial.

On May 2, 1995, the case was transferred for trial to Retired Judge Macklin Fleming.

On May 8, 1995, Judge Fleming ordered the issue of whether the partnership agreement was fully integrated to be tried before the court as phase one of the trial.

After hearing the evidence offered in phase one of the trial, Judge Fleming on May 12, 1995, ruled that the 1992 partnership agreement is unambiguous, integrated and of full force. He also ruled that the parol evidence rule applies, and that Heller's expulsion was in accordance with the agreement.

Phase two of the trial began on May 15, 1995.

At trial, Heller testified he was "very disappointed" when he saw the Los Angeles magazine article "because it really doesn't reflect who I am or what I'm about." Heller admitted that the photograph accompanying the article was taken for the magazine.

At the close of Heller's case on June 16, 1995, defendants moved for nonsuit. On June 19, the trial court partly granted defendants' motion. The court dismissed with prejudice Heller's first cause of action for breach of express contract, second cause of action for breach of implied contract, third cause of action for breach of fiduciary duty, fifth cause of action for intentional infliction of emotional distress, and punitive damages claims. The court also dismissed with prejudice Heller's fourth cause of action for intentional interference with prospective economic advantage as to defendants McNamara, Peck and Stafford. On July 10, 1995, the trial court issued an order granting nonsuit.

On June 21, 1995, after the two remaining defendants, the Pillsbury law firm and Patterson, presented their case, they moved for a directed verdict. The trial court did not grant the motion.

That same day, outside the jury's presence, the trial court discussed with counsel what jury instructions it planned to give. The court refused to give instructions requested by Heller's counsel.

On June 22, 1995, following counsel's closing arguments and the trial court's jury instructions, the jury began deliberations on Heller's cause of action for intentional interference with prospective economic advantage.

Judge Fleming tried Heller's sixth cause of action for an accounting. On June 26, 1995, the trial court dismissed this cause of action with prejudice, holding Heller's claim for an accounting lacked merit. The trial court subsequently issued a dismissal order on July 10, 1995.

Also on June 26, 1995, the jurors announced they were deadlocked. Consequently, the trial court discharged the jury and declared a mistrial.

On July 5, 1995, defendants Pillsbury and Patterson noticed a motion for entry of judgment for them pursuant to Code of Civil Procedure section 630, subdivision (f).

On July 25, 1995, the trial court issued an order granting defendants' motion.

That same day, the trial court entered a judgment against Heller and in favor of all the defendants.

On July 21, 1995, Heller moved for the trial court to either strike defendants' memorandum of costs or alternatively tax certain costs items. A hearing on the motion was set for August 7, 1995. Partly granting the motion, the trial court awarded defendants $884 in filing and motion fees, $1,041.88 in jury fees, $48,700.76 in deposition costs, $1,973.80 in service-of-process costs, $5,220 in witness fees, $2,223.50 in recorder fees during trial, and $4,766.13 in costs of models, blowups and photocopies of exhibits. The costs award totaled $64,810.07.

## DISCUSSION

Heller asserts the following five major arguments on appeal:

1. The trial court exceeded its jurisdiction and committed reversible error by ordering a phase one court trial instead of jury trial on whether the

1992 partnership agreement was fully integrated and binding, and whether the Pillsbury Executive Committee had the power to expel partners without cause;

2. The trial court erred in granting a partial nonsuit;

3. The trial court erred in dismissing Heller's accounting cause of action;

4. The trial court erred in granting defendants' motion for judgment under Code of Civil Procedure section 630, subdivision (f), after the mistrial due to the deadlocked jury; and

5. The trial court erred in awarding defendants certain costs.

We discuss the arguments in the order they are raised.

1. *Did the trial court exceed its jurisdiction and commit reversible error by ordering a phase one court trial on whether the 1992 partnership agreement was fully integrated and binding, and whether the agreement authorized the Pillsbury Executive Committee to expel partners without cause?*

■ Heller contends that Judge Fleming countermanded Judge Lachs's denial of summary judgment by ordering that the trial court first determine the issue of whether the partnership agreement was fully integrated, before the jury tried the case. We disagree. Heller is correct that the law and motion judge found that "a trier of fact should be left to determine whether the power to expel was inadvertently left out of the [1991] partnership agreement or was never meant to be an express power of the [Executive] committee." However, a trier of fact can be a jury or a court, and the law and motion judge did not prohibit the trial judge from acting as a trier of fact.

■ Further, "[t]he purpose of summary judgment is to penetrate evasive language and adept pleading and to ascertain, by means of affidavits, the presence or absence of triable issues of fact. [Citation.] Accordingly, the function of the trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves. [Citation.]" (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

■ Moreover, the issue of a contract's integration "must be resolved preliminarily by the court, not a jury, and only after the court finds the

agreement not integrated may parol evidence be admitted to amplify its terms." (*Mobil Oil Corp.* v. *Handley* (1978) 76 Cal.App.3d 956, 961 [143 Cal.Rptr. 321].) Accordingly, subdivision (d) of Code of Civil Procedure section 1856, which sets forth the parol evidence rule[4] applied by the trial court, states: "The court shall determine whether the writing is intended by the parties as a final expression of their agreement with respect to such terms as are included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement."

Therefore, the trial court properly ordered that it, and not a jury, first determine the issue of whether the partnership agreement was fully integrated.

Review of the trial court's determination is subject to "the same deference on appeal as any other ruling of the court on an issue of fact." (*Mobil Oil Corp.* v. *Handley, supra,* 76 Cal.App.3d at p. 961, citing *Salyer Grain & Milling Co.* v. *Henson* (1970) 13 Cal.App.3d 493 [91 Cal.Rptr. 847].) Under the applicable "substantial evidence" test, we review the record in the light most favorable to respondents, we do not weigh the evidence, and we indulge all intendments and reasonable inferences which favor sustaining the trier of fact's findings.[5] (*Id.* at p. 500.)

Heller claims the 1992 partnership agreement is not integrated, noting the absence of an integration clause in the agreement. ■ However, the parties' intent that a written agreement be integrated "may be manifested even in the absence of an explicit statement to that effect . . . ." (*Wagner* v. *Glendale Adventist Medical Center, supra,* 216 Cal.App.3d 1379, 1386.) Moreover, Code of Civil Procedure section 1856 does not require an integration clause. Instead, the statute requires a court to look to the parties' intent. ■ In examining the parties' intent, the trial court in this case properly and necessarily considered the circumstances surrounding the partnership agreement.

Two of Heller's witnesses, who were former Pillsbury partners, testified in the "phase one" preliminary court trial that they understood the Executive

---

[4]The parol evidence rule generally prohibits the introduction of extrinsic evidence to alter or add terms of an integrated written contract. (Code Civ. Proc., § 1856; *Alling* v. *Universal Manufacturing Corp.* (1992) 5 Cal.App.4th 1412, 1433 [7 Cal.Rptr.2d 718]; 2 Witkin, Cal. Evidence (3d ed. 1986) Documentary Evidence, § 960, p. 908.)

[5]We recognize that a more recent case, *Wagner* v. *Glendale Adventist Medical Center* (1989) 216 Cal.App.3d 1379, 1385-1386 [265 Cal.Rptr. 412], applies the independent judgment or de novo standard of review to determine whether a contract is integrated. Since the trial court's determination of whether the partnership agreement is integrated depended on the court's consideration of evidence of the partners' intent, we believe the substantial evidence test is the appropriate standard of review.

Committee had power to expel partners. None of Heller's witnesses testified that there was a collateral partnership agreement for 1992.

Similarly, defendants' witnesses testified in phase one of the trial that the Executive Committee inherited Pillsbury's former management committee's power to expel. These witnesses included Michael Steel, a Pillsbury attorney who became a partner in 1989 after seven years as an associate and who was not part of the firm's management.

Defendant McNamara testified that he drafted Pillsbury's partnership agreements, and that he inserted a "reserve powers clause" because he thought "it would be comforting to the partners at large to know clearly that they had the . . . reserve power to override the Executive Committee in the event that we should ever have . . . a runaway Executive Committee which was damaging the firm in some respect." McNamara explained that the reserve power to expel a partner "would be somewhat meaningless if it was not the intent to grant to the Executive Committee the power to expel a partner."

The 15-page agreement contained clear terms consistent with the intent testified to in phase one of the trial. For example, article II of the 1992 agreement explicitly provided that the "Executive Committee shall be the . . . governing authority of the Firm." Article II, entitled Firm Governance, specified that, among other things, the Executive Committee "shall . . . admit or expel partners . . . ." Article VIII, entitled Reserved Powers, stated: "Notwithstanding the power delegated to the Executive Committee under Article II, the Regular Partners reserve the right to . . . expel any Partner from the partnership without cause . . . . [¶] It is understood and agreed that the Executive Committee shall exercise the powers delegated to it under Article II unless and until the Partners exercise their reserved powers under this Article VIII." Article X, Disputes, of the 1992 partnership agreement provided: "In the event of a dispute of any kind between the parties to this Agreement, or between any of the parties to this Agreement and the representative . . . of any . . . expelled Partner, . . . it is agreed that the decision of the Executive Committee of the Firm shall be final, binding and conclusive upon all persons interested in such dispute."

While Code of Civil Procedure section 1856 does not exclude evidence on the three issues of mistake of the written agreement, validity of the agreement or fraud, Heller's first amended complaint contained no causes of action raising these issues. In fact, the complaint validated the agreement by attaching a copy of the 1992 partnership agreement, and alleging that "Plaintiff and Defendants were subject to the provisions" of this agreement.

In addition, the record indicates no evidence of fraud or invalidity of the 1992 partnership agreement. Although Heller alleged that respondents misrepresented and concealed facts leading him to believe the 1992 partnership agreement did not authorize the Executive Committee to expel partners, these allegations do not amount to fraud. Moreover, Heller's misrepresentation claim lacks merit because the only purported misrepresentation with respect to the 1992 agreement is McNamara's cover memorandum accompanying the agreement. This one-page memorandum requested partners to return signed copies of the agreement to McNamara, and noted that an exhibit to the agreement was incomplete and that the "1992 Agreement is not materially different from the 1991 Agreement." Significantly, the memorandum does not state that it summarizes the agreement. Moreover, even if the 1991 and 1992 agreements were not identical, the substance with respect to partner expulsion was the same, and Heller does not refute that he read neither the 1991 nor 1992 draft or final agreements.

Reviewing the record in the light most favorable to respondents, we conclude substantial evidence supported the trial court's determination that the 1992 partnership agreement was fully integrated, thereby barring parol evidence contrary to that agreement.

## 2. *Did the trial court err in granting a partial nonsuit?*

Heller next contends the trial court erred in granting a partial nonsuit for defendants.

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor." ' [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' [Citation.]" (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].)

"Although a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is 'some substance to plaintiff's evidence upon which

reasonable minds could differ . . . .' [Citations.] Only the grounds specified by the moving party in support of its motion should be considered by the appellate court in reviewing a judgment of nonsuit. [Citations.]" (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656].)

 Heller contends the trial court erred in granting nonsuit on Heller's cause of action for express contract breach because even if the Executive Committee could expel partners, the committee's power was limited to expulsion for cause. However, this contention lacks merit, since the partnership agreement not only contains no language requiring expulsions for cause, but also states the partners' reserved powers include the right to "*expel any Partner* from the partnership *without cause* . . . ." (Italics added.) Although article II, which sets forth the Executive Committee's powers, does not specify that expulsion may be without cause, article VIII so specifies. Accordingly, the Executive Committee's power to expel was not limited to expulsion for cause.

In addition, Heller contends he presented evidence that his expulsion was in bad faith. ■ ■ Since this contention concerns a contract's implied covenant of good faith and fair dealing, we consider this issue in the context of the nonsuit on Heller's second cause of action for breach of implied-in-law contract.[6]

 Heller argues that defendants did not comply with the Uniform Partnership Act, and that by failing to do so, defendants' expulsion of Heller was by definition in bad faith. However, the Uniform Partnership Act does not prohibit partners from entering into partnership agreements, and in fact recognizes such agreements. For example, Corporations Code section 15018, which concerns partners' rights and duties in relation to their partnership, specifies that these rights and duties are "subject to any agreement between them . . . ."

Accordingly, the Washington State Court of Appeals upheld the expulsion of two law partners as pursuant to a partnership agreement. The agreement did not require that the expelled partners receive notice prior to the law

---

[6]With respect to the first cause of action, Heller also erroneously argues that under the Uniform Partnership Act set forth in Corporations Code section 15001 et seq., his expulsion required the firm's dissolution. (Corp. Code, § 15038.) This argument fails because the 1992 partnership agreement provided that "expulsion of a Partner . . . shall not dissolve the partnership." "While normally the . . . expulsion of a partner effects a dissolution of the partnership, where the agreement expressly provides otherwise the partnership continues and an accounting, winding up and dissolution is not required (Corp. Code, § 15031, subd. (b))." (*Cagnolatti* v. *Guinn* (1983) 140 Cal.App.3d 42, 48 [189 Cal.Rptr. 151].)

firm's executive committee's two meetings regarding the expulsion, and the agreement was silent as to whether expulsion shall be with or without cause. (*Holman* v. *Coie* (1974) 11 Wn.App. 195 [522 P.2d 515, 517, 519, 72 A.L.R.3d 1209].) The appeals court held that the partnership agreement's express language "must be controlling . . . . Where terms of a contract, taken as a whole, are plain and unambiguous, the meaning is to be deduced from the contract alone." (*Id.* at p. 521.) Although the *Holman* case was decided in another jurisdiction, we consider this decision persuasive authority because Washington state applies the Uniform Partnership Act. (*Bartlome* v. *State Farm Fire & Casualty Co.* (1989) 208 Cal.App.3d 1235, 1242 [256 Cal.Rptr. 719]; 9 Witkin, Summary of Cal. Law (9th ed. 1989 supp.) Partnership, § 1, p. 112.)

Where, as here, clear and integrated law partnership agreements contain clauses authorizing expulsions through "the guillotine approach," and law partners are expelled pursuant to the agreements, there is no breach of the duty of good faith. (*Holman* v. *Coie, supra,* 522 P.2d at pp. 523-524.)

Just as Heller identifies no express terms of the 1992 agreement that defendants allegedly breached, he does not offer evidence showing defendants breached any implied-in-law contract. Therefore, the trial court's grant of nonsuit was proper.

With respect to his first cause of action for express contract breach, Heller also argues that defendants violated their fiduciary duty to Heller by subjecting him to continued liability after his expulsion, citing Corporations Code section 15038. Since this argument concerns breach of fiduciary duty, we consider this issue in the context of the nonsuit on Heller's third cause of action. This argument lacks merit because section 15038, which concerns partners' rights upon their partnership's dissolution, clearly does not apply here. (*Cagnolatti* v. *Guinn, supra,* 140 Cal.App.3d at p. 48.) In addition, nowhere in Heller's complaint does he allege wrongful exposure to partnership liabilities.

Again, the express terms of the 1992 partnership agreement are controlling. These terms provided for dissolution and compensation of the expelled partner. Article IX, entitled Limitations, stated: "Each of the Partners hereby expressly agree . . . that the payments provided to be made to him . . . in the event of . . . expulsion . . . represent the full purchase price and total value of his or her interest in the partnership and its property . . . , and shall be in full settlement of his or her interest in the partnership . . . ."

Heller also argues that the trial court erroneously adopted two arguments made by defendants. Heller claims defendants' first argument is that since

there was no breach of agreement, there was no breach of fiduciary duty to plaintiff. He maintains the second argument is that "all claims of breach of fiduciary duty on grounds other then [sic] for expulsion relate to fairness of partnership compensation and disagreements about the internal operation of the partnership, both of which ostensibly do not give rise to a fiduciary duty as a matter of law."

■ Although partners owe each other and the partnership a fiduciary duty, this duty "applies only to situations where one partner could take advantage of his position to reap personal profit or act to the partnership's detriment." (*Leigh* v. *Crescent Square, Ltd.* (1992) 80 Ohio App.3d 231 [608 N.E.2d 1166, 1170].) ■ Relying on *Leigh* and *Holman, supra*, 522 P.2d 515, the Texas Court of Appeals held that the fiduciary duty as to partner expulsions is not to expel in bad faith. (*Bohatch* v. *Butler & Binion* (Tex.Ct.App. 1995) 905 S.W.2d 597, 602.) The court in *Bohatch* ruled that the phrase "bad faith" in the context of an expelled partner "means only that partners cannot expel another partner for self-gain." (*Ibid.*)

Like Heller, the plaintiff in *Bohatch* was a law partner expelled from a law firm. (*Bohatch* v. *Butler & Binion, supra*, 905 S.W.2d at pp. 599, 600.) Colette Bohatch claimed her partners expelled her partly to acquire her partnership interest. The Texas appeals court rejected this claim. "Bohatch's partnership share was so small, however, that the jury could not have reasonably concluded that the partners' expulsion of Bohatch was motivated by their desire to acquire her partnership share." (*Id.* at p. 604.)

Similarly, in the present case, the evidence does not show that defendants expelled Heller to enrich themselves at Heller's expense. While his expulsion from the firm increased all Pillsbury partners' profit shares, given the large number of partners in 1992[7] and the fact that Heller was earning toward the lower end of the firm's compensation range,[8] the increase was insubstantial.

More importantly, even with evaluating the evidence in the light most favorable to Heller, the evidence shows that the Executive Committee expelled Heller because of a loss of trust in him. "The foundation of a professional relationship is personal confidence and trust. Once a schism develops, its magnitude may be exaggerated rightfully or wrongfully to the point of destroying a harmonious accord. When such occurs, an expeditious

---

[7]There were more than 200 partners, with over 100 earning more than Heller, 38 compensated at Heller's same level, and less than 90 earning at a lower level than Heller.

[8]Even if Heller were given compensation credit for bringing in CB Commercial as a Pillsbury client, his expulsion still would not have significantly increased the other Pillsbury partners' profit shares.

severance is desirable. To imply terms not expressed in this partnership agreement frustrates the unambiguous language of the agreement and the result contemplated." (*Holman* v. *Coie, supra*, 522 P.2d at p. 524.) We find the Washington's appellate court's analysis equally applicable here. Accordingly, we uphold the grant of nonsuit on Heller's cause of action for breach of fiduciary duty.

■ With respect to the nonsuit on Heller's fifth cause of action for intentional infliction of emotional distress, as Heller points out, the California Supreme Court set forth the four elements of a cause of action for intentional infliction of emotional distress: " '(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress.' " (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 946 [160 Cal.Rptr. 141, 603 P.2d 58], quoting *Newby* v. *Alto Riviera Apartments* (1976) 60 Cal.App.3d 288, 296 [131 Cal.Rptr. 547].)

■ However, Heller did not meet his burden of proof on the first element. During the June 11, 1992, meeting with McNamara, Patterson and Peck when Heller was told he was expelled, no one attacked Heller personally.[9] Instead, McNamara explained the firm could not trust Heller because he ignored Peck's June 1, 1992, directive not to communicate to Rosenberg of Bank of America. According to Heller's testimony at trial, McNamara explained that because of Heller, Bank of America threatened to fire Pillsbury. McNamara also cited the Apple, Reebok and Los Angeles magazine incidents as other reasons for Heller's termination from the firm. Early in the meeting, McNamara told Heller that he no longer had access to the computers, that Heller's key card was canceled, and that if Heller was not out by noon the next day, there would be a lock on his office door. In addition, McNamara told Heller that he would get his monthly check, be reimbursed the capital he paid the firm, and receive additional money. Heller testified that Patterson said a few times, " 'This is your punishment. Accept it.' " Heller also testified that McNamara called the "Why I Fired My Secretary" piece of paper "trash" and threw it at Heller.

The activities of McNamara, Patterson and Peck do not constitute outrageous conduct. Although the 1992 partnership agreement did not require the

---

[9]Respondents argue that Heller is limited to focusing on respondents' postexpulsion conduct. We disagree. At the conclusion of phase one of the trial, the trial court ruled that Heller's fifth cause of action "is valid insofar as it relates to anything [*sic*] done after the discharge after the termination." Heller's counsel did not orally object to this ruling at the time it was made, even though he specifically asked for clarification of the ruling. However, Heller promptly filed a supplemental brief which argued that this cause of action was viable as to allegations concerning the manner in which Heller's expulsion was conducted. Therefore, Heller is not estopped from asserting the trial court's ruling as error.

Executive Committee to explain the reasons for their decision to expel Heller, McNamara told Heller why he was expelled. Significantly, the meeting was held in the conference room outside the presence of others, and Heller did not testify that McNamara, Patterson or Peck raised their voices to such an extent that they could be heard outside of the conference room. The evidence therefore shows that the firm attempted to maintain Heller's privacy. Obviously, it can be distressing for any individual when that individual is told to leave. However, the distress of being terminated does not by itself give rise to a viable emotional distress cause of action. Further, to hold the defendants' conduct outrageous could open the floodgates of litigation any time a partner is terminated from a partnership. Such a holding would disturb partnerships, which by their nature require trust between the partners.

Nor did Heller show that the guard posted at his office upon his expulsion engaged in outrageous conduct. As testified by Heller at trial, the guard was a young man who worked in the mail room. The guard said he was instructed not to leave Heller, and he followed Heller to the elevator. We find no fault in Pillsbury's decision to use a guard. To the contrary, it is a reasonable business practice to monitor the activities of someone just expelled from the office, in order to protect the business from any possible damage from the expelled individual.

As for defendants' postexpulsion activities, Heller did not meet his burden of showing outrageous conduct. Heller's first amended complaint alleged, as part of his cause of action for intentional infliction of emotional distress, that defendants "delayed releasing to Heller the proceeds of his capital account and other payments until March, 1993, and only after lengthy negotiations with Heller's legal counsel." In fact, Heller admitted he was fully reimbursed his capital account less than a year from his expulsion, which was well within the three-year deadline set forth in the partnership agreement.

Although defendants untimely made the 10 percent payment provided in the 1992 partnership agreement, defendants were only approximately three and a half months late in this payment. Such a delay is not outrageous.

Since Heller failed to satisfy this first requisite element of a cause of action for intentional infliction of emotional distress, there is no need to consider whether he met the remaining requisite elements of this cause of action.

For the same reason, we do not address Heller's challenges of the trial court's exclusion of certain pieces of evidence[10] and its consideration of defendants' affirmative defense in ruling on their motion for nonsuit.

■ With respect to the trial court's grant of nonsuit on punitive damages, Heller argues the trial court improperly limited his punitive damages claim to his fourth cause of action for intentional interference with prospective economic advantage.[11] In support of this argument, Heller cites *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286] and *Sequoia Vacuum Systems* v. *Stransky* (1964) 229 Cal.App.2d 281 [40 Cal.Rptr. 203]. Heller also contends that the trial court erroneously eliminated his punitive damages claim from his fourth cause of action for intentional interference with prospective economic advantage.

As Heller points out, punitive damages are recoverable for intentional infliction of emotional distress and breach of fiduciary duty. (*Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d at p. 404; *Sequoia Vacuum Systems* v. *Stransky, supra,* 229 Cal.App.2d at p. 289.) Therefore, the trial court erred in limiting Heller's punitive damages claim the way it did. However, this error was harmless because Heller failed to meet his burden of proof with respect to the third and fifth causes of action.

Moreover, the trial court correctly recognized that a punitive damages claim requires proof by "clear and convincing evidence." Civil Code section 3294, subdivision (a) allows for punitive damages in a tort action "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice . . . ." Subdivision (c) defines the terms "malice," "oppression" and "fraud" for section 3294 purposes: "[¶] (1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others. [¶] (2) 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. [¶] (3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material

---

[10]Heller appeals the trial court's exclusion of testimony on Heller's emotional distress from the following five individuals: (1) Heller's girlfriend; (2) Heller's son; (3) Steven Leibovitz, an independent financial consultant who met Heller when Leibovitz was at City National Bank's entertainment division; (4) psychologist Lilli Friedland, Ph.D., an expert witness; and (5) sociologist Michael Miller, Ph.D., another expert witness. He also challenges the exclusion of his allegedly anguished audiotaped voice-mail messages for defendants.

[11]The trial court limited Heller's punitive damages claim at the conclusion of the phase one court trial preceding the jury trial. Although it is clear that the court limited Heller's third cause of action for breach of fiduciary duty to compensatory damages, the record suggests that the trial court did not limit Heller's fifth cause of action for intentional infliction of emotional distress.

fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

Review of the record in the light most favorable to Heller nevertheless supports nonsuit on all his punitive damages claims, especially given the burden of proof which is higher than the preponderance-of-the-evidence burden of proof required for Heller's causes of action.

*3. Did the trial court err in dismissing Heller's accounting cause of action?*

Heller argues that Corporations Code section 15022 entitled him to an accounting. Section 15022 states: "Any partner shall have the right to a formal account as to partnership affairs: [¶] (a) If he is wrongfully excluded from the partnership business or possession of its property by his copartners, [¶] (b) If the right exists under the terms of any agreement, [¶] (c) As provided by Section 15021,[12] [¶] (d) Whenever other circumstances render it just and reasonable."

None of the four reasons set forth in Corporations Code section 15022 apply here. First, the record does not show that Heller was wrongfully excluded from partnership business. To the contrary, the record indicates that Heller was expelled pursuant to the 1992 partnership agreement because Pillsbury lost trust in Heller. Second, the agreement itself did not provide for an accounting. Instead, it detailed the expelled partner's compensation rights.[13] Third, Corporations Code section 15021, by its very terms, is inapplicable. (See fn. 12.) And fourth, the record does not indicate any other circumstances entitling Heller to a formal account of partnership affairs.

---

[12]Corporations Code section 15021, which concerns a partner's accounting to a partnership, provides: "[¶] (1) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property. [¶] (2) This section applies also to the representatives of a deceased partner engaged in the liquidation of the affairs of the partnership as the personal representatives of the last surviving partner."

[13]Article VII, Omission or Expulsion, of the 1992 partnership agreement stated in pertinent part: "Upon the . . . expulsion of a Partner, he or she shall receive the amount of his or her agreed capital contribution over a three-year period as provided under Article III(E). In addition, within six (6) months after the date of a Partner's . . . expulsion he or she shall receive ten percent (10%) of the amount actually distributed to him or her during the calendar year immediately preceding such date, either in one payment or installments, at the discretion of the Executive Committee. In consideration for the right to receive said ten percent (10%), each of the Partners agree that in the event he or she should be . . . expelled, such Partner shall have no right to any payment of any kind or nature whatsoever in excess of the amount theretofore actually paid to him or her plus the amounts specified in this Article VII."

Moreover, as explained before (*ante,* at pp. 1385-1386), partners may contract to terms not set forth in the Uniform Partnership Act. In the present case, the Pillsbury partners in fact did so in article VII of the 1992 partnership agreement.

In addition to citing certain provisions of the Uniform Partnership Act, Heller refers to two cases, *Jewel* v. *Boxer* (1984) 156 Cal.App.3d 171 [203 Cal.Rptr. 13] and *Rosenfeld, Meyer & Susman* v. *Cohen* (1987) 191 Cal.App.3d 1035 [237 Cal.Rptr. 14]. The first case does not apply because it concerns a dissolved partnership where there was no partnership agreement. (*Jewel* v. *Boxer, supra,* 156 Cal.App.3d at p. 174.) The second case also is not controlling because the partners there apparently did not have a partnership agreement providing for the obligations owed to partners by other partners who dissolved their at-will partnership.[14] (*Rosenfeld, Meyer & Susman* v. *Cohen, supra,* 191 Cal.App.3d at pp. 1041-1042.)

Further, it is well settled that "[e]quitable principles apply in determining the rights of the parties to an action for an accounting between partners, for dissolution of the partnership, and settlement of its affairs." (*Bates* v. *McTammany* (1938) 10 Cal.2d 697, 700 [76 P.2d 513].) Absent an abuse of discretion, we will not disturb the trial court's decision to dismiss Heller's sixth cause of action for an accounting.

4. *Did the trial court err in granting defendants' motion for judgment under Code of Civil Procedure section 630, subdivision (f), after the mistrial due to the deadlocked jury?*

Heller contends that the trial court erred in granting defendants' motion for judgment under Code of Civil Procedure section 630, subdivision (f). He maintains that the court should have instead allowed Heller's fourth cause of action for intentional interference with prospective economic advantage be reset for trial.[15]

Code of Civil Procedure section 630, subdivision (f) states in relevant part: "When the jury for any reason has been discharged without having rendered a verdict, the court . . . may order judgment to be entered in favor of a party whenever a motion for directed verdict for that party should have been granted had a previous motion been made."

Since this statute refers to directed verdicts, we apply the standard of review for directed verdicts. Accordingly, we view the evidence in the light

---

[14]We assume there was no partnership agreement because that is the ordinary meaning of the phrase "partnership at will."

[15]Heller also argues that defendants' conduct constituted unfair competition. However, since his complaint does not contain a cause of action for unfair competition, we do not consider this argument.

most favorable to Heller, resolve all conflicts and inferences in his favor, and reverse the judgment if substantial evidence tends to prove all the elements of appellant's case. (*Colbaugh* v. *Hartline* (1994) 29 Cal.App.4th 1516, 1521 [35 Cal.Rptr.2d 213].)

Heller argues that the trial court improperly invoked subdivision (f) of Code of Civil Procedure section 630 because the court previously denied defendants' motion for a directed verdict. In support of his argument, Heller cites 7 Witkin, California Procedure (3d ed. 1985) Trial, section 426, page 425. Section 426, however, merely quotes the statute without explaining the statute's meaning. Even if Witkin did support Heller's argument, Witkin is a treatise and consequently not binding law.

In urging reversal, Heller maintains his case is "procedurally akin" to *Jaehne* v. *Pacific Tel. & Tel. Co.* (1951) 105 Cal.App.2d 683 [234 P.2d 165]. Like the trial court in the present case, the trial court in *Jaehne* denied the defendant's motion for a directed verdict, and subsequently granted the defendant's motion for a judgment after the jury deadlocked and a mistrial was declared. (*Id.* at p. 685.) Although Division Three of the Second District Court of Appeal reversed the trial court, it did so upon examination of the particular record in that case. Since each case has its own individual record, the fact that a trial court was reversed in one case does not mean that reversal is required in a different case. Therefore, the reversal in factually distinguishable *Jaehne* does not warrant reversal here. Reversal would be warranted only if, under the applicable standard of review, substantial evidence tends to prove all the elements of Heller's fourth cause of action for intentional interference with prospective economic advantage.

The trial court instructed the jury on the following five elements of the tort of intentional interference with prospective economic advantage: "First, a relationship existed between the plaintiff and other law firms containing probable future economic benefit or advantage to plaintiff, and there is no question here that such relationship existed; [¶] (2) The defendants knew of the existence of the relationship, and there is no question here about that. The question is involved in three other elements of the cause of action; [¶] (3) Defendants intentionally engaged in acts or conduct designed to interfere with or disrupt this relationship; [¶] (4) The relationship was actually interfered with or disrupted; and [¶] (5) The acts of the defendants were designed to interfere with or disrupt this relationship and, in fact, did so and caused damage to the plaintiff." This instruction is derived from BAJI No. 7.82 prior to its 1996 revision prompted by *Della Penna* v. *Toyota Motor*

*Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376 [45 Cal.Rptr.2d 436, 902 P.2d 740].[16]

Heller contends that the trial court erred by focusing on Heller's relationship with other law firms as prospective employers, rather than his relationship with prospective clients.[17] In view of the record, we disagree.

Citing *Diesel Electric Sales & Service, Inc.* v. *Marco Marine San Diego, Inc.* (1993) 16 Cal.App.4th 202 [20 Cal.Rptr.2d 62] and *Miesen* v. *Bolich* (1960) 177 Cal.App.2d 145 [1 Cal.Rptr. 912], Heller also contends that the trial court erred by considering defendants' affirmative defenses. In granting defendants' motion under Code of Civil Procedure section 630, subdivision (f), the trial court did not state at the hearing whether or not it considered defendants' affirmative defenses. Even if the court did consider the affirmative defenses, neither cited case supports Heller's contention.

The first case, *Diesel Electric Sales & Service, Inc.* v. *Marco Marine San Diego, Inc., supra,* 16 Cal.App.4th 202 merely stated, "if the plaintiff's evidence, when viewed most favorably to the plaintiff, constitutes substantial evidence in support of a jury verdict in favor of the plaintiff, if one were ultimately so rendered, then a motion for nonsuit must be denied. [Citation.] Alternatively stated, if the plaintiff's evidence, when most favorably viewed, provides substantial evidence in support of each element of a prima facie case without any affirmative defense, then a nonsuit judgment is improper and must be reversed." (*Id.* at p. 211.)

The second case likewise does not assist Heller. As Heller points out, *Miesen* states that "[t]he rule as to motions under section 630 is the same as that applicable to nonsuits and directed verdicts." (*Miesen* v. *Bolich, supra,* 177 Cal.App.2d at p. 155.) However, nowhere does the *Miesen* opinion prohibit consideration of affirmative defenses.

---

[16]In *Della Penna,* the California Supreme Court held that ". . . a plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful 'by some measure beyond the fact of the interference itself.' " (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra,* 11 Cal.4th at p. 393.)

[17]The trial court rejected the following version of BAJI No. 7.82 requested by Heller: "The plaintiff Philip Heller also seeks to recover damages based upon a claim of intentional interference with prospective economic advantage. [¶] The essential elements of such a claim are: [¶] 1. An economic relationship existed between the plaintiff and his prospective clients, containing a probable future economic benefit or advantage to plaintiff; [¶] 2. The defendant knew of the existence of the relationship; [¶] 3. The defendant intentionally engaged in acts or conduct designed to interfere with or disrupt this relationship; [¶] 4. The economic relationship was actually interfered with or disrupted; and [¶] 5. The acts of the defendant which were designed to interfere with or disrupt this relationship caused damage to the plaintiff." Judge Fleming refused to adopt Heller's focus on prospective clients because he found "no credible evidence whatsoever to support it . . . ."

Among the statements that defendants made, Heller objects to Patterson's statements to Baker & McKenzie when considering Heller as a prospective partner at the firm. Patterson told Madda, a Baker partner, the following: "We [Pillsbury] are talking with Phillip about finalizing his separation from the firm and as a courtesy I'm going to ask you not to probe into my answer. I need to be fair to both sides and protect both sides. Phillip's departure was a result of disagreements on policy issues regarding business generation and client contacts within our structure. There was nothing illegal to our knowledge and we wish him well. He is an aggressive business seeker. He has several friends among the partners who I'm sure would speak well of him in terms of his performance, but until we reach a final resolution they do not want to be contacted."

Heller's own deposition testimony, read at trial, regarding what Heller told Madda substantiates Patterson's statements. Moreover, Heller testified that he himself told Madda that Heller did not engage in illegal activities at Pillsbury, and that Heller preferred not to go into details about Pillsbury.

In light of the record viewed under the applicable standard of review, we hold that no substantial evidence supports Heller's fourth cause of action for intentional interference with prospective economic advantage.

5. *Did the trial court err in awarding defendants certain costs?*

Heller argues that the costs award should be reduced by at least $24,845.06 from $64,810.07 to $39,965.01. He contests seven portions of the costs award.

Code of Civil Procedure section 1032 authorizes the trial court, "in its discretion," to award costs. Accordingly, this issue is subject to the abuse-of-discretion standard of review. Under this standard of review, a trial court's ruling is reversed only where it is shown there is a "clear abuse of discretion" and a "miscarriage of justice." (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 331 [216 Cal.Rptr. 718, 703 P.2d 58]; *Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].) "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 478-479 [243 Cal.Rptr. 902, 749 P.2d 339].)

Heller first contests the trial court's award of $9,793.68 for videotape costs on grounds that assessment of both stenographic deposition transcripts and videotape costs are excessive and unfairly burdensome, and

videotaped depositions were unnecessary.[18] According to the uncontroverted declaration of defendants' trial counsel, Heller initiated the videotaping of all depositions, except for three expert witnesses and two percipient witnesses. In response, Heller's trial counsel declared that he advised defense counsel that Heller "did not intend to use deposition videotapes at trial unless the witness was unavailable to service of process." This court does not feel compelled to give great weight to this argument, in view of the fact that Heller initiated the videotaping of depositions. Under the circumstances, the trial court did not abuse its discretion in awarding costs for videotaped depositions.

He next contests $4,064.26 in costs for expedited stenographic deposition transcripts as unnecessary, claiming that defendants added double charges for the expedited processing. The record indicates that the costs were for transcripts of nine expert witnesses deposed less than a month before trial. We recognize that expert witnesses are customarily deposed soon before the trial date,[19] thereby necessitating expedited transcripts so there is time to try to ensure the transcripts' accuracy and for an opponent's expert witnesses to review those transcripts. Therefore, the trial court did not abuse its discretion in awarding these costs.

Heller contests $1,040 in costs for "min-u-scripts" and $992.50 in costs for ASCII disks. Although defendants' "min-u-scripts" and ASCII disks of depositions already videotaped and transcribed appear to be somewhat repetitive, we cannot say the awarding of costs results in a miscarriage of justice. Therefore, we do not disturb the award of these costs.

Fifth, Heller contests $4.90 a page for nonexpedited deposition transcripts as excessive because Heller paid $3.75 a page. He urges that defendants' net nonexpedited $28,503.32 deposition transcript charge should be reduced by 23 percent to $21,947.56. The trial court's award of defendants' costs for nonexpedited transcripts and photocopies does not result in a miscarriage of justice, even though Heller's counsel obtained cheaper rates for nonexpedited transcripts and photocopies.

Likewise, we find no abuse of discretion in the trial court's decision to award defendants' requested exhibit photocopying costs. Heller contests the $3,266.13 in costs as excessive because defendants were charged 17 cents a copy instead of 4 cents or less per copy.

---

[18]Heller argues that he videotaped many depositions "to facilitate less contentious depositions" rather than to use those videotapes at trial.

[19]In fact, the earliest a party must produce expert witness information, is if the opposing party demands such information after the setting of the initial trial date. (Code Civ. Proc., § 2034.)

Seventh, Heller argues that the trial court abused its discretion in awarding $622.80 in costs for exhibit tabs as not authorized by statute. Having failed to specify the statute prohibiting such costs, Heller does not sustain his argument. Moreover, even if such costs were improper, there is no miscarriage of justice.

Lastly, without citing any legal authority, Heller contends that the trial court abused its discretion in not considering the parties' respective financial positions. Whenever a plaintiff initiates litigation, the plaintiff takes the risk that the defendant may be the prevailing party in the action. Certainly, a plaintiff who is a civil litigator knows that a trial court is statutorily authorized to award the prevailing party reasonable costs. Accordingly, we reject this contention.

### DISPOSITION

The judgment and order are affirmed. Costs on appeal are awarded to respondents.

Lillie, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied December 11, 1996.