Richard E. MUSSETTER,
et al., Plaintiffs,

v.

Richard E. LYKE, et al., Defendants.

No. 96 C 7657.

United States District Court,
N.D. Illinois,
Eastern Division.

June 24, 1998.

---

**2.** Those caveats do not apply here.

Frank P. Tighe III, Oak Brook, IL, for Plaintiffs.

Howard C. Goode, Northbrook, IL, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, Senior District Judge.

This Court's conduct of a March 1998 bench trial in this action has been followed by the submission of proposed findings of fact and conclusions of law by counsel for plaintiffs Richard Mussetter ("Mussetter") and his wife Kimberly (collectively "Mussetters") and counsel for defendants Richard Lyke ("Lyke") and Axiom Financial Services, Inc. ("Axiom"), followed in turn by each side's submission of a response to the other side's initial proffer. This Court has given full consideration to the parties' submissions and to its own trial notes (in aid of a partial transcript and its own independent recollection), and what follows are this Court's Findings of Fact ("Findings") and Conclusions of Law ("Conclusions") in accordance with Fed. R.Civ.P. ("Rule") 52(a). To the extent (if any) that the Findings as stated may be

deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both of those respects, see *Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

### Findings of Fact

1. In August 1988 Illinois citizen Lyke became a member of the Board of Directors ("Board") of already-existing Delaware corporation HealthTek, Inc. ("HealthTek") (Stip ¶ 5 [1]). In or about July 1990 Lyke became Chairman of the Board (Stip.¶ 8). At some time before 1992 Lyke followed the recommendation of a friend (whom he had brought onto the HealthTek Board) in selecting Howard C. Goode, Esq. ("Goode") to become HealthTek's general counsel (Tr. 96–98 [2]).

2. On or about June 10, 1991 HealthTek received notice from the National Association of Securities Dealers ("NASD") stating that HealthTek's shares would be delisted from NASDAQ unless it provided NASD with documentation demonstrating that it met certain capital and surplus criteria. To comply with those criteria, in September 1991 the Board authorized the issuance of 2 million shares of $.25 preferred stock to Lyke, and as of October 4 HealthTek issued those shares to Lyke (P.Ex. 13 at 12). As payment for the shares Lyke agreed to the cancellation of a HealthTek $500,000 short term note payable to him (P.Ex. 14). As of December 31, 1991 Lyke owned approximately 48.1% of the outstanding HealthTek shares (Stip.¶ 10).

3. In 1991 Lyke also began a series of discussions with Garry Prime ("Prime") concerning a HealthTek merger with, or the acquisition of HealthTek by, a company controlled by Prime (Prime Dep. 51–66). During those conversations Prime suggested to Lyke that HealthTek should be restructured and that it should use less manufacturing

space and should employ fewer personnel (*id.* 63, 77).

4. On or about March 5, 1992 [3] HealthTek entered into a License Agreement with Xomed–Treace, Inc. ("Xomed") (P.Ex. 7) in exchange for a percentage royalty based upon sales. HealthTek granted a license to Xomed to manufacture and sell a certain medical device known as a "scope scrubber" (Stip.¶ 9).

5. On or about March 23 California citizens Mussetters entered into an Industrial Real Estate Lease ("Lease," D.Ex. 3) with HealthTek (Stip.¶ 11) demising approximately 12,000 square feet in an Auburn, California facility for a term of three years and one month beginning March 23, 1992 and ending April 23, 1995 (Stip.¶ 12).

6. On March 27 HealthTek announced the total recall of all unused ("ADFuse") medical devices that it had previously manufactured and sold to customers. Sales of ADFuse devices had accounted for 9% of HealthTek's total 1991 sales (Stip.¶ 14). After the announced recall Lyke had more than one conversation with Roger Molina ("Molina"), then a HealthTek employee, in which Lyke expressed concern about the impact that the ADFuse recall would have upon his investment in HealthTek (Molina Dep. 22–23).

7. On or about April 13 Lyke (among others) signed and HealthTek filed its Securities and Exchange Commission ("SEC") Form 10–K for the year ended December 31, 1991 (P.Ex. 108), reporting $911,000 in secured indebtedness to Lyke as of December 31, 1991 (*id.* at 30).

8. On May 22 Mussetters leased an additional 2,000 square feet of space at the Auburn, California facility to HealthTek for six months with an option to renew (P.Ex. 26 at 7). On or abut that date HealthTek complet-

---

1. All "Stip." citations refer to the Statement of Uncontested Facts that is part of the August 29, 1997 Final Pretrial order ("FPTO") in this case.

2. All "Tr." citations refer to the trial transcript, while "Citation Tr." references are to Lyke's testimony during citation-to-discover-asset proceedings on December 20, 1995 and February 22, 1996 (see Finding 53). Because the parties ordered the transcription of Lyke's trial testimo-

ny alone, all "Tr." references involve that testimony—as to the in-court testimony of other witnesses, this Court has relied on its own extensive trial notes and its recollection, in addition to which a substantial part of the non-documentary evidence came via depositions.

3. Because most of the relevant dates in this action were in 1992, hereafter all such dates will simply omit the year reference.

ed a move of equipment and inventory into the Auburn facility (*id*).[4] From that date until approximately December 13 HealthTek conducted manufacturing operations at the Auburn facility.

9. On or about June 15 Lyke and HealthTek executed a certain Forebearance [sic] Agreement prepared by Goode, which purported to rescind HealthTek's September 1991 issuance of the 2 million shares in preferred stock to Lyke and to reinstate the cancelled $500,000 in HealthTek's indebtedness to Lyke (P.Ex. 14). But despite Lyke's testimony to the contrary, which this Court discredits, the transaction contemplated by the Forebearance Agreement was not consummated and the $500,000 indebtedness remained cancelled (Lofvenholm Dep. 97–98, 114–15 and P.Ex. 26 at 3, 12, 13) (HealthTek's contemporaneous SEC Form 10–Q for the quarter ended June 30, 1992, showing the preferred stock as still outstanding and the company's indebtedness to Lyke at the reduced figure).

10. In the late spring or early summer of 1992, HealthTek's President and Board member Anders Lofvenholm ("Lofvenholm") told Lyke that HealthTek's bylaws required that an annual shareholders meeting be held. Lyke responded that he did not want to have such a meeting at that point because there were many issues that should be resolved before holding the meeting and before making a presentation to the shareholders. One of those issues was the formation of a company to be known as U.S. Medical, Inc. ("U.S.Medical"). HealthTek never held its annual shareholders meeting for 1992—its last annual meeting was in 1991 (Lofvenholm Dep. 120–23).

11. On or about July 30 Lofvenholm prepared and transmitted to Lyke a Memorandum entitled "Value of Royalty Agreement with Xomed–Treace, Inc. for the Scope Scrubber a.k.a EndoScrub" (P.Ex. 17). There Lofvenholm said:

> Considering uncertainty in projections and a possible shorter life span of the product a fair value of the agreement today is estimated at $1,000,000.

12. On or about July 31 Articles of Incorporation for U.S. Medical were filed with the North Carolina Secretary of State (P.Ex. 18). Before that date Lyke and Lofvenholm had a number of conversations as to several different ways to set up a system for the preservation of Lyke's investment in HealthTek, and they had eventually agreed on the formation of U.S. Medical (Lofvenholm Dep. 20–21). It was Lyke's belief and intention that U.S. Medical would operate as a sales organization to sell products to be manufactured by codefendant Axiom Financial Services, Inc. ("Axiom")(Lyke Dep. 37).

13. U.S. Medical's original shareholders and directors were Lyke, Lofvenholm, William H. Chase, III ("Chase," who was then a HealthTek employee) and Molina (P.Exs. 22, 31). As of August 3 U.S. Medical's records reflect an organizational shareholders' meeting, with all of its original shareholders, including Lyke, present in person or by proxy (P.Ex. 31). Though Lyke signed the minutes, he testified that he did not attend any U.S. Medical meeting until 1993. In the meantime, however, Lyke became a 25% shareholder on November 1 or 11 (P.Ex. 30, 31).

14. On about August 8 HealthTek filed its SEC Form 10–Q for the quarter ended June 30 (P.Ex. 26), reporting that as of June 30 the amount of its indebtedness to Lyke was $1.378 million (*id.* at 13). Elsewhere in the same Form 10–Q, however, HealthTek reported that the total debt in notes payable to shareholders was $1.207 million (*id.* at 3). HealthTek did not disclose to SEC, in that Form 10–Q or elsewhere, the facts (1) of U.S. Medical's organization, (2) of Lofvenholm's involvement in organizing and operating U.S. Medical or (3) of Lyke's involvement as a U.S. Medical shareholder and director. Any requirement of such disclosure would be questionable in light of the fact that those events had occurred after June 30. But that cannot be said as to other clearly material matters: HealthTek did not apprise SEC, in that Form 10–Q or elsewhere, of the fact that it had entered into an agreement with Lyke to rescind its 1991 issuance of preferred stock to Lyke.[5] Finally, HealthTek did not

---

4. On that date HealthTek also occupied approximately 5,000 square feet of warehouse space in leased premises in or near West Valley, Utah (P.Ex. 9 at 6).

5. As Lyke's Response to Mussetters' proposed Findings and Conclusions ("Lyke Response") points out, the Form 10–Q at 13 does say that Lyke had agreed to forbear on any effort to

disclose to SEC, in that Form 10–Q or elsewhere, the fact that it had entered into the Xomed License Agreement.

15. On or about August 14 Goode filed with the California Secretary of State a Release by which HealthTek's only secured creditor other than Lyke released his security interest in HealthTek's assets (Stip.¶ 17).

16. In August Lofvenholm told Lyke that he intended to move to North Carolina (Tr. 25–26, 31). On or about August 31 Lofvenholm transmitted to Lyke, via fax, a document outlining the basis for a contractual agreement between "HealthTek, Inc. and/or its successor" and U.S. Medical (P.Ex. 27), along with a document entitled "Detailed Duties of U.S. Medical" (P.Ex. 28). before that date Lyke and Lofvenholm had held discussions about such an agreement (Lofvenholm Dep. 163).

17. In August or September Molina began a process of seeking bids from other companies to manufacture HealthTek's products with manufacturing equipment that belonged to HealthTek and was located at the facility owned by Mussetters (Molina Dep. 19).

18. In late September a judgment was entered against HealthTek in an Ohio state court (P.Ex. 13 at 12). Lyke had been in attendance at the trial (Tr. 100–01). That judgment triggered Lyke's decision to call the loans owed to him by HealthTek (Lofvenholm Dep. 90–91). In October Lyke inquired of HealthTek's general counsel Goode as to how he could go about calling the loans owed to him by HealthTek (Tr. 24). Goode began to represent Lyke in connection with his efforts to foreclose on such loans, even though Goode continued to serve as HealthTek's general counsel (Tr. 93).

19. On or about October 1 Lofvenholm and Lyke agreed that U.S. Medical would take over responsibility for invoicing and collecting HealthTek's accounts receivable (Lofvenholm Dep. 165). Lofvenholm then prepared a document reflecting such an agreement (P.Ex. 29) and transmitted that document to Lyke for his signature.

20. In October Lofvenholm did move from California to North Carolina so that he could operate U.S. Medical (Lofvenholm Dep. 16). As of October 1 Lofvenholm was still HealthTek's President and a Board member. Upon Lofvenholm's departure Molina became HealthTek's general manager (Molina Dep. 9).

21. During October and November (before November 28) HealthTek received bids from several other companies to manufacture HealthTek's products with manufacturing equipment that belonged to HealthTek and was located at the facility owned by Mussetters (Molina Dep. 32–34). Ultimately Lyke selected Medical Molding Corporation of America ("CIMCO") to conduct such manufacture (Tr. 49).

22. At some time between October 1 and November 30 HealthTek informed its customers by letter that payments owing to HealthTek were to be paid to U.S. Medical (Lofvenholm Dep. 168–72).

23. On or about October 15 HealthTek sold certain of its manufacturing equipment for making flexible plastic containers to a company known as "Plasco," with Plasco entering into a long term agreement to supply such containers to HealthTek (P.Ex. 13 at 13). Plasco's purchase price was $240,000, with $100,000 as a down payment and the $140,000 balance to be paid with certain inventory to be manufactured by Plasco with the equipment (Lofvenholm Dep. 102–05). Lyke himself negotiated and "set up" the transaction (Tr. 47–48) and signed the agreement as HealthTek's "chairman of the board" (D.Ex.50). Although Lyke contends that $100,000 of the purchase price was allocable to a tool—a "vented spike mold"—that the agreement referred to as owned by Lyke and leased to HealthTek, this Court discredits that testimony:

 (a) No allocation of *any* part of the purchase price to the spike mold was con-

---

collect on his indebtedness until August 31, 1992 (although Lyke's counsel misleadingly calls that "a reference to the Forebearance Agreement" as such, it is not). But the *amount* listed for the indebtedness clearly did not include the $500,-

000 that had previously been surrendered by Lyke in exchange for the preferred stock, and the preferred stock was showing as still outstanding (see Finding 9).

tained in the agreement. Agreement § 5.1 provided that the *entire* purchase price, including the $100,000 to be paid in cash as well as the $140,000 to be taken as a credit against future manufactures ordered by HealthTek, was payable to *HealthTek* and not to Lyke.

(b) Lyke had ordered the spike mold in late September 1991, to be delivered 16 to 18 weeks later, for a purchase price of $58,850. When Lyke later asked for and received the $100,000 payment directly (see Finding 24), he did not reflect his receipt of the $100,000 as the proceeds of sale of the spike mold on his income tax return.

In light of Lyke's control of both sides of the transaction (including his lawyer Goode's wearing of two hats in the relationship between Lyke and HealthTek), the inferences are to be drawn against Lyke: What he did was to coopt up to $100,000 of HealthTek's money (see Finding 24), an amount that should have been credited against its indebtedness to him.

24. On or about October 15 Lyke told Lofvenholm that he wanted Plasco's $100,000 down payment to be sent directly to Lyke and not HealthTek (Lofvenholm Dep. 102). Plasco did pay Lyke that sum directly between that date and December 18. Plasco later paid the $140,000 balance with inventory supplied to U.S. Medical (*id.* 105).

25. On or about October 29 Lyke drafted a form of letter for Molina's signature, sending it via fax from Glenview, Illinois to Molina in Auburn, California. Molina then caused the letter (P.Ex. 65) to be typed on HealthTek letterhead and to be transmitted to Mussetters on October 30 (Molina Dep. 36–37). HealthTek's letter (a) notified Mussetter that it intended to vacate the additional 2,000 square feet it had leased (see Finding 8) on November 23 (at the conclusion of the six month lease) and (b) requested a prompt return of HealthTek's security deposit when it vacated the space. But HealthTek's letter (c) did not disclose that HealthTek intended to vacate, or to discontinue paying rent on, the remainder of the space (misleadingly stating instead that the added space had "greatly assisted us in becoming resettled in your [Mussetters'] building") and (d) also falsely stated that Lofvenholm was

"absent on an extended business trip," when Lofvenholm had in fact already permanently relocated his residence to North Carolina.

26. On about November 16 HealthTek filed its SEC Form 10–Q for the quarter ended September 30 (P.Ex. 13), reporting that as of September 30 the amount of its indebtedness owed to Lyke, including accumulated interest, was $1.532 million (*id.* at 6, 13). Elsewhere in the same Form 10–Q, however, HealthTek reported that the total debt in notes payable to shareholders was $1.318 million (*id.* at 3). Nor did HealthTek disclose to SEC, in that Form 10–Q or elsewhere, the fact that it had entered into the Xomed License Agreement with Xomed.

27. By definition HealthTek did not ever disclose to SEC the value of its rights under the Xomed License Agreement. Before November 16 Lofvenholm had frequent discussions with Lyke as to whether that value should be disclosed to SEC in HealthTek's Form 10–Q. In those discussions Lofvenholm took the position that such a disclosure should be made, while Lyke took the position (which was ultimately followed) that no such disclosure should be made (Lofvenholm Dep. 137–39).

28. Lyke resigned from HealthTek's Board effective November 10 (P .Ex. 13 at 13). Lyke's testimony during the citation-to-discover-assets proceeding following Mussetters' obtaining of a judgment against HealthTek (see Finding 46) was that he had actually resigned during the summer of 1992 in anticipation of the transfers at issue (Citation Tr. 64–66):

Q. When did you most recently cease serving as a member of the board of directors of HealthTek?

A. I think it was in the summer of '92 I probably resigned, to the best of my recollection.

\* \* \* \* \* \*

Q. Why did you resign?

A. I was dissatisfied with the operation of the company.

Q. With whose operation of the company?

A. Well, the company's fortunes appeared to be dismal.

Q. How did your resignation have anything to do with that, sir?

A. How did it have any connection with that?

Q. Yes.

A. I certainly was giving consideration to calling the loans I had to the company, and I'd be a creditor of the company.

Q. You resigned as a director of the company because you wanted to exercise your right as a creditor of the company, isn't that right?

A. I thought there was a conflict in me being a creditor pressing for payment at the same time I'm sitting on the board responding to that pressing of the claim.

This Court does not credit that testimony as to a claimed summer of 1992 resignation, finding instead that Lyke's fiduciary obligations as a HealthTek director continued at least until the effective date of his resignation referred to in this Finding 28. At least as importantly, that formal and nominal severance was not mirrored in the reality of the relationship. Indeed, given HealthTek's insolvency and Lyke's dominant position with the company even after that resignation, coupled with the other related factors reflected in these Findings; this Court finds that his fiduciary obligations continued with respect to his conduct in the enforcement of the debt owed to him by HealthTek—at least through the sale of HealthTek's assets to himself.

29. On or about November 17 Mussetter learned through reading a newspaper article that appeared in the *Sacramento Bee,* that HealthTek soon planned to discontinue operations and to go out of business. Of course both Lyke and Lofvenholm had already known that HealthTek was going to cease operations soon and that its assets were going to be transferred to Lyke or to a corporation to be wholly owned by him. For that purpose Lyke and Lofvenholm made a business trip to Europe and New York City during November to introduce Lyke to certain of Lofvenholm's business contacts. Despite the trip's intended benefit to Lyke, HealthTek paid the costs associated with the trip (Lofvenholm Dep. 198–200).

30. On November 23 Lyke and Goode caused the organization of Axiom, an Illinois corporation with its principal place of business in Illinois, for the purposes of acquiring and holding the assets of HealthTek that Lyke intended to cause to be transferred to him. From the time of its organization to the present, Lyke has owned all of the Axiom shares (Tr. 29–30).

31. On the same November 23 date Lyke published a legal notice in an Auburn, California newspaper announcing a November 30 UCC sale of HealthTek's assets. Lyke published no other advertisement relating to the sale (Tr. 93).

32. On November 25 HealthTek was already delinquent in rent owed to Mussetters. Accordingly they then caused HealthTek to be served with a certain "Three (3) Day Notice To Pay Rent or Quit" (P.Ex. 91), claiming an amount of delinquent rent.

33. At least as of November 28, each of HealthTek's distributors had been informed that U.S. Medical would be the distributor's future contact for HealthTek products (Lofvenholm Dep. 205).

34. Meanwhile, at some time between October 1 and November 28 Lyke had asked Lofvenholm to prepare a list ascribing a value of $750,000 to HealthTek's assets (Lofvenholm Dep. 184–86). Accordingly, on November 28 Lofvenholm transmitted from North Carolina to Lyke in Glenview, Illinois a seven-page "Asset List" (P.Ex. 33) with a two-page cover letter (P.Ex. 32). Those documents ascribed the following likely liquidation values (or "real values") to certain of HealthTek's assets:

(a) HealthTek's accounts receivable other than those owed by Plasco: $150,000 (P.Ex. 33, Lofvenholm Dep. 228–29);

(b) inventories: $150,000 (P.Ex. 33);

(c) cash in the approximate amount of $40,000 (*id*);

(d) office equipment, furniture, fixtures, molds and tools: $85,540 (*id.*); and

(e) machinery and equipment: $151,340 (*id*).

35. Before November 30 Lofvenholm had made repeated suggestions to Lyke that HealthTek should be represented by an attorney other than Goode, who (as Lofvenholm understood correctly) also represented Lyke. Lyke refused the suggestion and di-

rected that Goode should continue to represent HealthTek (Lofvenholm Dep. 181–83).

36. On November 30 HealthTek was insolvent (Stip.¶ 22). During October, November and/or December, after it had become known that HealthTek intended to transfer its assets to Lyke or to a corporation wholly owned by him, HealthTek incurred certain trade payables in excess of $72,970.17 that had not been paid as of March 1993 (P.Ex. 50).

37. On November 30 four or five men appeared at HealthTek's facility in Auburn, California in a group (Molina Dep. 53–54). Although it is not clear how that came about, it appears that they were HealthTek shareholders who wanted to learn what was going on and whether they could tour the company's facility (id. 54, Lofvenholm Dep. 217–18). Molina telephoned Lofvenholm in North Carolina for instructions and then led those persons on a plant tour. None of them was provided any information about HealthTek's financial affairs, its accounts receivable or the Xomed License Agreement, though Molina believes he told them there was a $750,000 bid for the company (Molina Dep. 55–56). Molina was not aware if he was there to receive bids (id. 57). Lyke was not present—indeed, he was not in the State of California that day (id. 60).

38. Thereafter on the same day Lofvenholm communicated with either Lyke or Goode by telephone, and Lofvenholm was told that a sale of HealthTek's assets to Lyke had been completed that day in Chicago. According to Lyke's trial testimony, on that day he telephoned a $750,000 successful bid for HealthTek's assets to Molina (Tr. 72, 88). Neither Lyke nor HealthTek had the assets appraised (Citation Tr. 43). Instead Lyke picked the $750,000 figure "out of the air" (id. 43, 44).[6]

39. From November 30 through December 13 manufacturing operations continued at the Auburn, California facility, using the equipment and inventory that had purportedly been transferred to Lyke or to Axiom on November 30 (Molina Dep. 62–65). From December 7 through Sunday, December 13 output at the facility was actually increased through the use of certain additional, temporary assembly workers provided by a temporary employment agency, which went unpaid for its services (id. 66–67; see also P.Ex. 102 (the Worknet invoices) and P.Ex. 50).

40. Shortly after November 30, all of HealthTek's cash on hand on November 30 (D.Ex. 54 shows that to have totaled $32,744) was transferred to U.S. Medical (Lofvenholm Dep. 208). On December 10 U.S. Medical transferred $20,000 back to HealthTek for payroll purposes (P.Ex. 95).

41. On or about December 9 Molina met with representatives of CIMCO at the Auburn facility to demonstrate to those CIMCO representatives HealthTek's manufacturing processes and to show those representatives equipment that was to be moved to the facility operated by CIMCO in Costa Mesa, California (Molina Dep. 76–78). On December 18 HealthTek vacated the Auburn facility. With Lyke's authorization (Tr. 34) all of the physical assets that had been housed there were removed through the use of three semis: one destined for CIMCO's facility, another destined for HealthTek's Utah warehouse and the other destined for Plasco in Gurnee, Illinois. After December 18 all mail addressed to HealthTek was forwarded to U.S. Medical in North Carolina.

42. On December 18 Mussetters began a civil action against HealthTek in the Superior Court of California, County of Placer (the "California Action"), asserting their rights under the Lease. HealthTek was served with summons and complaint through Molina later that day (Stip.¶ 24).[7] From December

---

6. This Court rejects the assertion in Lyke Response 4–5 that the $750,000 "was arbitrarily selected because it was known by him to be far in excess of the true value of the subject collateral assets." Though Lyke so testified (Tr. 73), it is refuted by all of the objective evidence referred to in these Findings—instead the $750,000 figure, though indeed arbitrary, was arbitrarily low by a wide margin. It constituted plainly inadequate consideration for the transferred assets.

7. Although Lyke Response 5 points out that Stip. ¶ 24 refers to Molina as "a former HealthTek employee," that is a real red herring. Lyke's own proposed Finding 84 refers to the judgment entered against HealthTek (see Finding 46 here), and nothing in his proposed Findings and Conclusions questions the validity of that judgment.

18 through April 23, 1995 the space that Mussetters demised to HealthTek pursuant to the Lease remained vacant (Stip.¶ 23).

43. At some time after November 30 U.S. Medical began exercising control over the Utah facility, taking over the lease there, making payments on HealthTek's behalf and assuming employment of the warehouseman who was responsible for that facility (Molina Dep. 68–69).

44. After November 30 and before February 1994, Lyke met periodically with Lofvenholm to discuss the status of the assets that had been transferred from HealthTek to Axiom (Lyke Dep. 29). On or about December 31 Axiom and Lyke entered into a Manufacturing Agreement with CIMCO (P.Ex. 68, Stip.¶ 25). Among other things that Manufacturing Agreement provided for CIMCO's manufacture of product for Axiom with equipment that had purportedly been transferred to Axiom by HealthTek and that had previously been located at the Auburn facility. In or about December 1992 or January 1993 Lyke met with Molina and with CIMCO representatives at CIMCO's Costa Mesa, California facility. Lyke observed the equipment and inventory that had been relocated from HealthTek's Auburn facility to CIMCO's facility (Molina Dep. 95–96).

45. In March 1993 U.S. Medical held a board meeting at Greensboro, North Carolina, with Lyke present. Lofvenholm then informed Lyke and others present that U.S. Medical had been financed in part by the ability to collect HealthTek accounts receivable as an agent for Axiom, without having to pass those monies on to Axiom immediately (P.Ex. 46; Tr. 55).[8]

46. On October 15, 1993 the court in the California Action entered a money judgment in the amount of $311,577.36 (including an attorney fee award) upon the Lease in favor of Mussetters and against HealthTek (Stip.¶ 26). That judgment remains wholly unsatisfied. Days after the judgment was entered, Mussetters wrote a letter to Lofvenholm and Lyke, notifying each of them that the judgment had been entered, complaining about their roles in the transfers of HealthTek's assets and placing Lyke on notice that they intended to hold him personally responsible for the judgment. On November 16, 1993 Lofvenholm forwarded a copy of that letter to Lyke to ensure that Lyke had received it (P.Ex. 75, Lofvenholm Dep. 298–300). On or about March 1, 1994 the Delaware Secretary of State declared HealthTek's corporate charter void (Stip.¶ 29).

47. During 1993 Xomed or its successor paid Lyke or Axiom $156,374.78 in royalties pursuant to the April 1992 License Agreement between Xomed and HealthTek (Stip.¶ 30). During 1994 Xomed or its successor paid Lyke or Axiom $137,076.79 in Royalties pursuant to that License Agreement (*id.*).

48. In or about January 1994 Lyke or Axiom paid CIMCO $17,423.85 for certain charges related to the maintenance of equipment that had been moved from Auburn to CIMCO's facilities and which had purportedly been transferred to Axiom.

49. In or about February 1994 Lofvenholm and Molina transferred all of their shares in U.S. Medical to Lyke. At some earlier time Chase had ceased to be a shareholder in U.S. Medical. As a result of the transfers of U.S. Medical shares from Lofvenholm and Molina to Lyke, the latter became U.S. Medical's sole shareholder (Stip.¶ 27).

50. On or about April 15, 1994 Axiom filed its 1993 U.S. Income Tax Return for a Subchapter S Corporation (P.Ex. 58). Lyke prepared that and later Axiom returns himself, without the assistance of an accountant or a tax return preparer (Lyke Dep. 6, 20). That return showed Axiom as having $1,852,-578 in assets as of January 1, 1993: $140,000 in trade notes and accounts receivable, $912,-578 in intangible assets and $800,000 in buildings and other depreciable assets. That $140,000 figure referred to the $140,000 debt that Plasco owed HealthTek arising out of the October 1992 sale of equipment to Plasco, while the $912,578 figure represented the

---

**8.** It may be noted parenthetically that the minutes of the meeting (P.Ex. 46) described a letter to HealthTek's creditors describing a proposed payment schedule as having been "composed by Richard E. Lyke's attorney, Howard Goode." At the same time, nothing in the record reflects anyone other than Goode as having represented HealthTek throughout.

rights arising under the April 1992 License Agreement between Xomed and HealthTek and the $800,000 figure referred to other assets transferred from HealthTek to Axiom or Lyke.

51. In or about October 1994 Lyke and U.S. Medical commenced a civil action against Lofvenholm, Molina and Chase in a Massachusetts state court. In the Complaint that commenced the action (P.Ex. 64), Lyke alleged that U.S. Medical had been an "outgrowth" of HealthTek (*id.* ¶ 8) and that he had transferred to U.S. Medical all of the assets owned by HealthTek as part of the organization of U.S. Medical (*id.*).

52. On or about April 15, 1995 Axiom filed its 1994 U.S. Income Tax Return for a Subchapter S Corporation (P.Ex. 59), again prepared by Lyke alone. That return showed Axiom as having $1,642,365 in assets as of January 1, 1994: $84,645 in trade notes and accounts receivable, $821,320 in intangible assets and $736,400 in buildings and other depreciable assets. That $84,645 figure referred to the unpaid balance of the original $140,000 debt from Plasco to HealthTek, while the $821,320 figure represented the rights arising under the April 1992 License Agreement between Xomed and HealthTek and the $736,400 figure referred to other assets transferred from HealthTek to Axiom or Lyke.

53. On June 29, 1995 Mussetters commenced supplementary proceedings in the Circuit Court of Cook County, Illinois by causing issuance of a Citation To Discover Assets to Lyke. On or about October 25, 1995 Mussetters caused a Request for Production of Documents to be served upon Lyke in those proceedings (P.Ex. 111). On both December 20, 1995 and February 22, 1996 Lyke gave testimony at Chicago, Illinois in those supplementary proceedings.

54. In his December 20, 1995 and February 22, 1996 testimony Lyke did not disclose the existence of the Xomed License Agreement, nor did he disclose that after November 30, 1992 he and Axiom had received

royalty payments pursuant to that License Agreement. On December 20, 1995 Lyke falsely testified (Citation Tr. 60–61):

Q: As part of the asset sale which you described as taking place in late 1992, did you purchase any other assets from HealthTek, Inc. other than those which are described in pages 14 through 18?

A. Well, there's that patent, we got that.

Q: And that's the patent you just testified about a few moments ago as having been transferred to U.S. Medical?

A: Yeah.

Q: Were there any other assets that you purchased?

A: Not that I can recall.

"Pages 14 through 18" referred to a five-page Asset List that Lyke had produced in the supplementary proceedings in response to plaintiffs' Request for Production (P.Ex. 66), consisting of the first five pages of the seven-page Asset List (P.Ex. 33) that Lofvenholm had transmitted to Lyke on November 28, 1992 (see Finding 34). Because HealthTek's rights in the Xomed License Agreement are described only in pages six and seven of that asset list, Lyke's omission of those two pages from his response to the discovery request improperly concealed the Xomed agreement from disclosure to Mussetters.[9]

55. Also included among the documents that Lyke produced on December 20, 1995 was a page Bates-stamped 000107, a copy of the December 31, 1990 Form UCC–1 that had been filed with the California Secretary of State, and a page Bates-stamped 000108, a copy of the second page of the Release that had been filed on August 14, 1992. By numbering and producing those two pages in serial order, Lyke intended to mislead Mussetters into believing that the pages were part of the same document, so that plaintiffs would incorrectly believe that the December 31, 1990 UCC–1 filing covered the collateral

---

9. Lyke Response at 5 asserts disingenuously that Lyke's testimony was not untrue in having failed to disclose the Xomed agreement because, his counsel says:

No direct question as to the agreement or any license or contract agreements, was asked.

Does counsel mean to suggest that the Xomed agreement was not an asset? Once again this kind of attempted semantic sleight of hand cannot be countenanced—it serves as handmaiden to Lyke's own deceptive production (or rather nonproduction) described in the text.

that had been described in the Release. During his December 20, 1995 testimony Lyke misleadingly referred to the pages as if they constituted one document.[10]

56. Lyke also testified in the December 20, 1995 proceedings (Citation Tr. 17–18):

Q: Are you, sir, or are your attorneys in possession of any other financial statements of HealthTek, Incorporated other than the ones that you have looked over this morning?

A: Gosh. Are there any old records? I wouldn't be surprised if the archives would be in some of the mess in my attic, that there might be some papers from, say, 1988, '89. When I was a stockholder, they might have sent out quarterly or annual reports, I don't remember.

Q: Okay. What efforts, if any, did you undertake sir, to make sure that you were producing all the financial statements of HealthTek, Incorporated that were in your possession and control?

A: Producing all the financial records?

Q: All the financial statements.

A: I guess in my opinion, the records I have were not classified according to whether they were records of the company or whether they were rough draft or projection or just what they were. And I didn't know what was—what I had in my possession. I guess to the extent that perhaps there are additional financial records, I probably hadn't brought them all in today. I probably—I suppose there might be some old records. And if it's your demand and my attorney says I must do it, I'll go back and go through all my records and see that they're sent to you.

That testimony was also false and misleading. On December 20, 1995 U.S. Medical was in possession of financial statements of HealthTek other than those that Lyke had produced to Mussetters. In or about February 1994 those documents had been sent to Lyke's attorney Goode or to U.S. Medical's new location in Massachusetts at Lyke's direction (Lofvenholm Dep. 31–33).[11] In addi-

tion Lyke was in possession of copies of Axiom's income tax returns, though he did not produce them either. Furthermore, though Lyke disclosed his involvement in the transfers at issue on that day, he did not disclose Axiom's involvement or even its existence.

57. On December 20, 1995 Lyke also falsely testified (Citation Tr. 73–74):

Q: Okay. What happened to HealthTek, Incorporated's accounts receivable?

A: Again, I don't know what happened to those, either.

Q: Was it your understanding that you had a security interest in them?

A: I don't know.

Q: Do you know if you acquired them as part of the asset sale?

A: I don't know anything about that.

Q: And you don't believe that there was ever any kind of a record prepared that would demonstrate whether that, in fact, is the case. Is that accurate, sir?

A: You're asking do I know if there was ever a record. I don't recall any of the details on that.

Q: Okay. Do you know whether any of the accounts receivable were ever transferred, whether by you or by anyone else to U.S. Medical, Incorporated?

A: Well, I—No, I didn't transfer anything else to U.S. Medical.

Q: My question to you, sir—I didn't mean to interrupt you. If you weren't finish, go ahead.

A: No, I didn't transfer any accounts.

Q: Do you know if anyone else ever did?

A: I don't know what happened to that account—I mean, in that area. I really don't know.

58. On December 20, 1995 Lyke further falsely testified (*id.* 78–79):

---

**10.** As with the prior Finding, Lyke Response at 5 says of the deceptive presentation described in the text:

They [the juxtaposition of the two pages, with the omission of the first page of the Release] did not mislead. It was an inadvertent error.

But that claimed "inadvertence" is unsupported by the record.

**11.** On December 20, 1995 Lyke owned a two-thirds ownership interest in U.S. Medical.

Q: Was any of the machinery which HealthTek, Incorporated had in its possession at the time it ceased doing business ever transferred to a location in southern California?

A: I don't know exactly what happened to the machinery.

\* \* \* \* \* \*

Q: What happened to the machinery and equipment after you acquired it?

A: I don't—I don't—I don't recall.

Q: You have no recollection as to what happened to it?

A: No, I really don't. I mean, that's too detailed for me. I don't keep track of those things.

59. And on December 10, 1995 Lyke also falsely testified (*id.* 42–43, 44):

Q: Who was present at the sale?

A: I think—besides myself, I think John Wright used to be president of HealthTek years ago. I think he came in during the course of the day. I think he came in, as I recall.

Q: How did you communicate your bid? In writing or orally or through some other fashion?

A: Well, I certainly conveyed it orally. I don't know whether—

Q: To whom?

A: I guess it was done to Anders [Lofvenholm] and to—he lived in the area, and he was in Auburn every day, and he would be the logical person to discern whether there was any interest of anybody else in bidding on it or what was going to happen.

I was just someone who came in from out of town, happened to be there on that date. I saw this as a requirement, in the interest of being fair to the stockholders of HealthTek and everything else, that it be advertised and—and who knows.

60. Then on February 22, 1996 Lyke gave additional testimony in the supplementary proceedings (Citation Tr. 114–16):

Q: What, if any, efforts have you made to determine whether you are or are not in possession of any other documents which are responsive to the request for production?

And by the way, I should indicate that certain records have been produced.

What efforts have you made, sir?

A: I just reviewed some old files that I had.

Q: What old files did you review, sir?

A: I have some old files that I keep for my various affairs from previous years in the attic in my house, and I went in the attic and looked for information that would respond to your request. And I found what I thought responded to your request.

\* \* \* \* \* \*

Q: Did you search anyplace else other than in your attic of that residence, sir?

A: No.

\* \* \* \* \* \*

Q: Are you aware of any records relating to HealthTek, Incorporated that are stored or kept in any place other than in the attic at your residence in Glenview?

A: No.

Again Lyke's testimony was false and misleading. On February 22, 1996 U.S. Medical was in fact still in possession of financial statements of HealthTek other than those that Lyke had produced to Mussetters (see Finding 56). On that date Lyke still owned a two-thirds ownership interest in U.S. Medical.

61. During 1995 Xomed or its successor had paid Lyke or Axiom $138,460.16 in royalties pursuant to the April 1992 License Agreement between Xomed and HealthTek (Stip.¶ 30). It will again be recalled that Lyke suppressed that or any other disclosure about that License Agreement in his documentary responses and his citation testimony—and it must be concluded that his conduct was deliberately misleading.[12]

12. Although Lyke Response at 6 attempts to minimize Lyke's deceptiveness as having been corrected in his deposition in this action, this Court rejects the assertion (*id.*) that "[a]ny incorrect information was the result of an unsuccessful good faith effort to recollect the facts or vague questions which failed to focus attention on the issues." To the contrary, the documentary nondisclosure coupled with the misleading sworn testimony confirms the finding in the text and further exhibits Lyke's lack of credibility that supports other Findings here.

62. On or about April 15, 1996 Axiom filed its 1995 U.S. Income Tax Return for a Subchapter S Corporation (P.Ex. 60), again prepared by Lyke alone. That return showed Axiom as having $1,426,170 in assets as of January 1, 1995: $29,428 in trade notes and accounts receivable, $730,062 in intangible assets and $663,680 in buildings and other depreciable assets. That $29,428 referred to the unpaid balance of the original $140,000 debt from Plasco to HealthTek, while the $730,062 figure represented the rights arising under the April 1992 License Agreement between Xomed and HealthTek and the $663,680 figure referred to other assets transferred from HealthTek to Axiom or Lyke.

63. During 1996 Xomed or its successor paid Lyke or Axiom $58,917 in royalties pursuant to the April 1992 License Agreement between Xomed and HealthTek (Stip.¶ 30).

64. On or about April 15, 1997 Axiom filed its 1996 U.S. Income Tax Return for a Subchapter S Corporation (P.Ex. 71), again prepared by Lyke alone. That return showed Axiom as having $1,229,764 in assets as of January 1, 1996: $638,804 in intangible assets and $590,690 in buildings and other depreciable assets. That $638,804 figure represented the rights arising under the April 1992 License Agreement between Xomed and HealthTek and the $590,690 figure referred to other assets transferred from HealthTek to Axiom or Lyke.

### Conclusions of Law

#### Jurisdiction

1. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1). It is a civil action between citizens of different States, with the amount in controversy exceeding the sum of $50,000 exclusive of interest and costs (that was the requisite jurisdictional amount when this action was filed in 1996).

#### Claim Preclusion[13]

■ 2. Whether Lyke and Axiom are bound in this diversity action by the October

1993 judgment against HealthTek in the California Action is a matter of California law (*Rekhi v. Wildwood Indus., Inc.,* 61 F.3d 1313, 1317 (7th Cir.1995)). To begin with, under California law default judgments may be given such claim preclusive effect (*Four Star Elec., Inc. v. F & H Constr.,* 7 Cal. App.4th 1375, 1380, 10 Cal.Rptr.2d 1, 3 (1992), a decision relied on in later cases as well).

■ 3. Under California law claim preclusion applies in situations when a practical approach reveals a sufficiently close relationship between a party in the current action and the party involved in the prior adjudication (*Martin v. County of Los Angeles,* 51 Cal.App.4th 688, 700–01, 59 Cal.Rptr.2d 303, 310–11 (1996)). Determining whether the parties are close enough for claim preclusion to apply requires application of a balancing test, comparing the rights of the nonparty in the prior action against the needs of judicial economy and the prevention of inconsistent judgments (*id.,* 51 Cal.App.4th at 701, 59 Cal.Rptr.2d at 311, quoting *Clemmer v. Hartford Ins. Co.,* 22 Cal.3d 865, 875, 151 Cal.Rptr. 285, 289, 587 P.2d 1098 (1978)).

■ 4. Here the relationship between HealthTek and Lyke, its principal shareholder and its Board chairman, presents a classic instance of the "close relationship" that justifies the application of claim preclusion (*Alshuler v. FDIC (In re Imperial Corp. of Am.),* 92 F.3d 1503, 1506 (9th Cir.1996), citing *Nordhorn v. Ladish Co.,* 9 F.3d 1402, 1405 (9th Cir.1993) and *United States v. Gottheiner (In re Gottheiner),* 703 F.2d 1136, 1139–40 (9th Cir.1983); *Amalgamated Sugar Co. v. NL Indus., Inc.,* 825 F.2d 634, 640 (2d Cir.1987); *Robinson v. National Cash Register Co.,* 808 F.2d 1119, 1124 (5th Cir.1987); *Sparks Nugget, Inc. v. Comm'r,* 458 F.2d 631, 639 (9th Cir.1972)). And that is so even though Lyke had nominally severed his Board position—recall that his tainted purchase of HealthTek's assets had rendered it

---

**13.** Although the litigants have spoken in terms of "collateral estoppel," this Court has always preferred to follow the United States Supreme Court's lead (see, e.g., *Baker v. General Motors Corp.,* — U.S. —, — n. 5, 118 S.Ct. 657, 664 n. 5, 139 L.Ed.2d 580 (1998)) by employing the more precise label of "claim preclusion," one branch of what the older cases call "res judicata." This opinion too will use the "claim preclusion" terminology, except perhaps in referring directly to cases that follow the older locution.

totally inactive so that any Board membership was really irrelevant. Not only did HealthTek have an adequate opportunity to litigate the principal amount of Mussetters' claim in the first instance, but *within days* after the judgment was entered Mussetters placed Lyke on notice such that—particularly given the nature of the relationship—he "should reasonably have expected to be bound by the prior adjudication" (*Clemmer*, 22 Cal.3d at 875, 151 Cal.Rptr. at 289, 587 P.2d 1098). Thus both HealthTek and Lyke had an opportunity to seek a vacation or modification of the judgment if they believed that the amount of the judgment was incorrect or improper (*id.*, 22 Cal.3d at 884–86, 151 Cal.Rptr. at 295–96, 587 P.2d 1098). This Court concludes that both HealthTek and Lyke are bound by the 1993 judgment against HealthTek in the California Action, so that both are precluded from contesting the principal amount of Mussetters' claim.

*Uniform Fraudulent Transfer Act ("UFTA") Claims*

5. California's enactment of UFTA § 4 (Cal.Civ.Code § 3439.04) provides in part:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor

were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his ability to pay as they became due.

■ 6. Under UFTA § 4 a plaintiff can prevail in two different and nonexclusive ways:

(a) under Section 4(a) by establishing so-called "actual fraud"—that the transfer at issue was made with the intent to hinder, delay or defraud a creditor; or

(b) under Section 4(b) in the case of so-called "constructive fraud"—where the transfer does not involve the exchange of "reasonably equivalent value."

Those methods are separate and distinct (*Reddy v. Gonzalez*, 8 Cal.App.4th 118, 122–23, 10 Cal.Rptr.2d 55, 57 (1992)). Thus a UFTA plaintiff prevails under Section 4(a) by demonstrating defendant's requisite intent, irrespective of the adequacy of the value exchanged.[14] Conversely, a UFTA plaintiff need not show any intent to defraud, delay or hinder to prevail under Section 4(b) if the evidence demonstrates inadequacy in the value exchanged (*Plotkin v. Pomona Valley Imports, Inc. (In re Cohen)*, 199 B.R. 709, 717 (9th Cir.BAP 1996)).

7. In this instance the unencumbered portion of HealthTek's property is an "asset" for UFTA purposes. UFTA § 1(a)(1) (Cal. Civ.Code § 3439.01(a)(1)) provides that an "asset" is property of the debtor, *except* only to the extent the property is encumbered by a valid lien. Uniform case law confirms the self-evident proposition that the unencumbered portion of a debtor's property is an "asset" for UFTA purposes (see, e.g., *Ransi-*

---

**14.** It is all of a piece with Lyke's misleading conduct, as detailed in the Findings, that his counsel totally misrepresents California law in this respect. Lyke Response at 7 says, citing *Lyons v. Security Pacific Nat'l Bank*, 48 Cal. Rptr.2d 174, 184, 40 Cal.App.4th 1001, 1019 (1995) and Cal.Civ.Code § 3439.08(a) as purported support for his statement:

There is no fraudulent transfer if a reasonably equivalent value is received by the debtor.

But exactly the opposite is true: *Lyons* (citing *Reddy!* ) *expressly* states, after setting out the actual fraud provision in UFTA § 4(a) and the constructive fraud provision in UFTA § 4(b):

Subdivision (a) is independent of section (b) *and does not require proof of anything more than actual intent to defraud.*

And as for Section 3439.08(a), it negates voidability under UFTA § 4(a) only if the transferee took in good faith *and* for reasonably equivalent value (which is precisely the opposite of saying that such value *alone* is enough to insulate against voidability). Counsel ought to realize how such flagrant mischaracterizations tend to cast a shadow of suspicion on any other representations that a lawyer has made to the court.

*er v. McFarland (In re McFarland )*, 170 B.R. 613, 622–23 (Bankr.S.D.Ohio 1994); *Rich v. Rich,* 185 W.Va. 148, 405 S.E.2d 858, 861 (1991)).

8. It is equally self-evident that a collusive foreclosure sale may be set aside as involving a fraudulent transfer (*BFP v. RTC,* 511 U.S. 531, 545, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994)) (interpreting the Bankruptcy Code's fraudulent transfer provision, 11 U.S.C. § 548, which is comparable to UFTA § 4); *Garrett v. Walker (In re Garrett,* 172 B.R. 29, 30 (Bankr.E.D.Ark.1994); *Bennett v. Genoa Ag Ctr., Inc. (In re Bennett )*, 154 B.R. 140, 147 (Bankr.N.D.N.Y. 1992); *Consumers Credit Union v. Widett (In re Health Gourmet, Inc.)*, 29 B.R. 673, 676 (Bankr.D.Mass.1983); *Sheffield Progressive, Inc. v. Kingston Tool Co.,* 10 Mass.App. Ct. 47, 405 N.E.2d 985, 987 (1980); accord, analysis in *United States v. Shepherd,* 834 F.Supp. 175 (N.D.Tex.1993), though that decision was later reversed for lack of federal jurisdiction to overturn a state forfeiture, 23 F.3d 923 (5th Cir.1994)).

9. It must be held here, and this Court concludes, that the transfers at issue involved a collusive foreclosure sale. Lyke was represented and assisted in connection with the sale and the transfers by HealthTek's own general counsel, who thus acted in a direct conflict-of-interest situation. Lyke was also assisted by HealthTek's President Lofvenholm, who had already been ensconced in another job working for a corporation (U.S.Medical) that was partially owned by Lyke and that planned to use equipment, inventory and accounts receivable that Lyke and Lofvenholm envisioned were to be transferred from HealthTek to Lyke pursuant to the sale. No representative of the secured party was even present to conduct the sale. Instead the "sale" was in actuality little more than a plant tour led by HealthTek employee Molina, who was the only person present capable of receiving a bid and who gave no relevant information to any potential bidders. Lyke contends that it was HealthTek employee Molina who received his bid—a truly bizarre contention where HealthTek was the debtor.[15] But equally important, that entire situation confirms that the "sale" did not

really affect HealthTek's continued control of the "sold" assets (a so-called "badge of fraud," see Conclusion 13).

10. It is of no significance that Mussetters are unsecured creditors (*Navistar Fin'l Corp. v. Stelluti (In re Stelluti )*, 167 B.R. 29, 33 (Bankr.S.D.N.Y.1994), *Sheffield Progressive,* 405 N.E.2d at 988; see West's Ann.Cal. Civ.Code § .3439 .04, Legislative Committee Comments—Assembly (1986 Addition) at 192 cmt. 8).

*A. "Actual Fraud" Claim under UFTA § 4(a)*

11. Even though California has not expressly codified the "badges of fraud," the legislative history of its version of UFTA demonstrates that those indicia of intent should be given consideration in determining whether a defendant has acted with intent to hinder, delay or defraud a creditor (see West's Ann.Cal.Civ.Code § 3439.04, Legislative Committee Comment—Assembly (1986 Addition)) ("In determining the existence or non-existence of actual intent to hinder, delay, or defraud creditors of a debtor, courts have given consideration to many factors, the so-called 'badges of fraud' "). See also *Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics, Inc.)*, 187 B.R. 315, 322 (Bankr. C.D.Cal.1995), tracing California's version of UFTA back to *Twyne's Case,* the seminal badges-of-fraud decision; *Wyzard v. Goller,* 28 Cal.Rptr.2d 608, 612, 23 Cal.App.4th 1183, 1191 (1994). UFTA lists eleven such indicia of intent to which consideration may be given (West's Ann.Cal.Civ.Code § 3439.04, Legislative Committee Comment—Assembly (1986 Addition)):

 (a) whether the transfer or obligation was to an insider;

 (b) whether the debtor retained possession or control of the property transferred after the transfer;

 (c) whether the transfer or obligation was disclosed or concealed;

 (d) whether the debtor had been sued or threatened with suit before the transfer was made or the obligation was incurred;

 (e) whether the transfer was of substantially all the debtor's assets;

---

**15.** This is just another facet of the self-dealing approach taken by Lyke, who has also been guilty of false testimony and other inequitable conduct reflected in the Findings.

(f) whether the debtor has absconded;

(g) whether the debtor had removed or concealed assets;

(h) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k) whether the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

There is a strong basis for considering that all 11 of the 11 so-called "badges of fraud" are present here. And even if there is room for a difference of view as to some of those "badges," the overwhelming majority are unquestionably present, so that this Court concludes that the transfers of assets were in fact made with the actual intent to hinder, delay or defraud creditors.

12. *Badge (a): Lyke and Axiom are insiders.* As taught by *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir.1992), citing in part *In re Friedman*, 126 B.R. 63, 70 (B.A.P. 9th Cir. 1991) and *In re Schuman*, 81 B.R. 583, 586 (B.A.P. 9th Cir.1987) ("The tests developed by the courts in determining who is an insider focus on the closeness of the parties and the degree to which the transferee is able to exert control or influence over the debtor"):

The cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the transferee and the debtor, and (2) whether the transactions between the transferee and the debtor were conducted at arm's length.

Accord, such cases as *Kepler v. Schmalbach (In re Lemanski)*, 56 B.R. 981, 983 (Bankr. W.D.Wis.1986), classifying transferee as an insider "if as a matter of fact, he exercises such control or influence over the debtor as to render their transactions not arms-length." Lyke and Axiom are plainly insiders under those established standards.

13. *Badge (b): HealthTek retained post-"transfer" possession and control over the purportedly transferred property.* Even though HealthTek's equipment, inventory and cash had purportedly been transferred to Lyke or Axiom on November 30, 1992, that transfer had no immediate impact on HealthTek's operations. HealthTek not only retained possession and control of those assets but also used them to manufacture product. Weeks later HealthTek transported to HealthTek's Utah facility certain of the equipment and inventory that had purportedly been transferred to Lyke or to Axiom (Molina Dep. 50). It was only sometime later that U.S. Medical began exercising control over the Utah facility, taking over the lease, making payments on HealthTek's behalf and assuming employment of the warehouseman who was responsible for the facility (*id.* 68–69). In the interim the equipment and inventory remained in HealthTek's possession and control.

14. *Badge (c): HealthTek and Lyke concealed, and Lyke lied about, the purported transfers.* Before the purported transfers HealthTek purposefully did not disclose to SEC (and hence did not make a matter of public disclosure), in HealthTek's Forms 10-Q, the fact that it had entered into the License Agreement with Xomed, nor did HealthTek there or ever disclose to SEC (and hence publicly) the value of its rights under the License Agreement with Xomed (Lofvenholm Dep. 133–39). HealthTek likewise concealed from its Forms 10-Q the fact that HealthTek had entered into an agreement with Lyke to rescind its 1991 issuance of 2 million shares in stock to Lyke in exchange for the reinstatement of debt. HealthTek also failed to disclose that Lyke had received $100,000 in cash as a result of the Plasco sale. HealthTek also kept its shareholders other than Lyke in the dark concerning such issues. It never held an annual meeting of shareholders during its last year of operation. Before the commencement of this action, Lyke twice gave citation testimony in supplementary proceedings relating to the judgment that Mussetters had obtained against HealthTek. Lyke's citation testimony was replete with

false denials of knowledge about HealthTek's disposition of its assets. Lyke also gave false testimony in those proceedings concerning the circumstances of the foreclosure sale, including false statements that he had been present. Lyke's production of documents in those supplementary proceedings involved the suppression and manufacture of evidence, including a failure to produce tax returns and financial statements, the deletion of pages from a document so as to conceal the existence of HealthTek's rights under the License Agreement, the manipulation of pages of separate financing statements to make it appear that the pages were part of the same document and, thereafter, the giving of testimony as to the manipulated pages as if they were part of the same document.

15. *Badge (d): HealthTek had been sued shortly before the purported transfers.* In late September 1992, about 60 days before the purported transfers, a judgment was entered against HealthTek in an Ohio state court after a trial that Lyke himself attended (P.Ex. 13 at 12; Tr. 100–01). Thereafter Lyke caused the transfers, in part at least to hinder or delay that judgment creditor (Lofvenholm Dep. 93–94). UFTA § 4(a) (Cal. Civ.Code § 3439.04(a)) provides relief where a transfer is made to hinder *any* creditor. It is enough for Mussetters to have proved that Lyke intended to hinder a creditor other than themselves (*In re Freudmann,* 362 F.Supp. 429, 432 (S.D.N.Y.1973) (citation omitted) ("Actual intent to defraud does not require an intent to defraud all creditors. It is enough if there is intent to defraud some creditors.")).

16. *Badge (e): Substantially all of HealthTek's assets were involved in the purported transfers.* This "badge" is too obviously satisfied to require comment.

17. *Badge (f): HealthTek absconded and faded away.* Two or three weeks after the purported transfers HealthTek departed California entirely. Thereafter HealthTek caused its mail to be forwarded to U.S. Medical in North Carolina. Although it technically continued to exist as a Delaware corporation until 1994, HealthTek filed no annual report with SEC for 1993, nor did it file any quarterly report with SEC after November

1992. In 1994 the Delaware Secretary of State declared HealthTek's corporate charter void.

18. *Badge (g): HealthTek and Lyke removed and concealed assets.* On December 18, 1992, after using the assets for more than two weeks post-"transfer," HealthTek vacated the facility owned by Mussetters and Lyke caused the removal of its physical assets that had been housed there to CIMCO's Southern California facility, to HealthTek's Utah facility or to Plasco in Illinois.

19. *Badge (h): HealthTek's value received was not reasonably equivalent to the value of the purportedly transferred assets.* Both because this "badge" requires more extended discussion and because it is also the key factor in the alternative claim of "constructive fraud," its discussion will be deferred to Conclusions 23–27.

20. *Badge (i): HealthTek was insolvent at the time of the purported transfers.* There is no dispute about this element.

21. *Badge (j): HealthTek's purported transfers occurred shortly before and shortly after it incurred substantial debt.* During October, November and December 1992, after it was known as an internal matter that HealthTek intended to transfer its assets to Lyke or to a corporation wholly owned by him, HealthTek incurred trade payables in the amount of $72,970.17 that it had not paid as of March 1993 (P.Ex. 50). In addition, HealthTek was delinquent in rent owed to Mussetters, and it was about to incur substantial debt to them by breaching its lease with them. Moreover, as discussed in Finding 18, a money judgment had also recently been entered against HealthTek.

22. *Badge (k): HealthTek transferred its essential assets to a lienor who then transferred the assets to a HealthTek insider.* Again no discussion is needed on this component of actual fraud. It was unquestionably present.

B. *"Constructive Fraud" Claim under UFTA § 4(b)*

23. Because HealthTek was concededly insolvent at the time of the transfers (Stip.¶ 22), California law[16] imposes the bur-

---

**16.** With state law providing the rule of decision as to the burden of proof (*Roberts & Schaefer Co.*

den on Lyke–Axiom to prove that the transfers involved what under prior law was termed "fair consideration" or "fair equivalent"—now under UFTA termed "reasonably equivalent value," (*Mayors v. Comm'r*, 785 F.2d 757, 760 (9th Cir.1986), citing *Kirkland v. Risso*, 98 Cal.App.3d 971, 977–78, 159 Cal. Rptr. 798, 801–02 (1979); *Neumeyer v. Crown Funding Corp.*, 56 Cal.App.3d 178, 190, 128 Cal.Rptr. 366, 373 (1976)). *Mayors, Kirkland* and *Neumeyer* involved interpretations of UFTA's predecessor statute, the Uniform Fraudulent Conveyance Act ("UFCA"), which California replaced with UFTA in 1986. Under California law the provisions of UFTA, to the extent that they are similar to those of UFCA, are to be considered as "restatements" and "continuations," not as new enactments (Cal.Civ.Code § 3439.12). Thus UFCA-based decisions such as *Mayors, Kirkland* and *Neumeyer* are well-considered and persuasive in interpreting UFTA (see, e.g., *Cortez v. Vogt*, 52 Cal.App.4th 917, 929, 60 Cal.Rptr.2d 841, 848 (1997); *Reddy*, 8 Cal.App.4th at 122–23, 10 Cal.Rptr.2d at 57; see also *Bay Plastics*, 187 B.R. at 322, tracing California fraudulent transfers law from its English origins, through UFCA, to its present-day UFTA).

■ 24. This Court also places the burden of proving reasonably equivalent value on Lyke and Axiom for the additional reason that they and their affiliate U.S. Medical are the repository and best source of documents and information relating to the transfers (see *ACLI Government Sec., Inc. v. Rhoades*, 653 F.Supp. 1388, 1391 (S.D.N.Y.1987) ("[W]here the evidentiary facts as to the nature and value of the consideration are within the transferee's control, the burden of coming forward with evidence on the fairness of the consideration shifts to the transferee")). But irrespective of who bears the burden of proof, it is well settled under California law that the question of whether reasonably equivalent value has been exchanged is to be determined from the creditor's perspective and standpoint (*Maddox v. Robertson (In re Prejean )*, 994 F.2d 706, 708 (9th Cir.1993); *Roosevelt v. Ray (In re Roosevelt )*, 176 B.R. 200, 206 (B.A.P. 9th Cir.1994); *Bay Plastics,*

187 B.R. at 329; *Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.)*, 174 B.R. 557, 578 (Bankr.N.D.Cal.1994)).

■ 25. Assets involved in contested transfers are to be measured at their values at the time of the transfer (*Pajaro Dunes*, 174 B.R. at 578); *Greer v. Greer*, 350 N.W.2d 439, 441 (Minn.App.1984) ("To determine whether an antecedent debt satisfied by the conveyance alleged to be fraudulent was fairly equivalent to the interest transferred, market value of the interest conveyed at the time of the transfer and the amount of the debt thereby satisfied must be proved"). And it is Lyke's forgiveness of $750,000 in antecedent debt, the $750,000 "bid price" and *not* the full amount of the debt then owed by HealthTek to Lyke, that controls for that purpose (*Gutierrez v. Lomas Mortgage (In re Gutierrez )*, 160 B.R. 788, 790 (Bankr. W.D.Tex.1993)) (applying the Bankruptcy Code's similar "constructive fraud" provision, 11 U.S.C. § 548(a)(2)(A), and emphasizing the difference between bidding in at less than the amount of the debt—thus leaving a deficiency—and bidding the full amount of the debt—thus wiping out any potential deficiency). In an instance of truly startling irony, Lyke Response at 20, seeking to dispute Mussetters' proposed conclusion in this respect, cites *Voutsiritsas v. Intercounty Title Co.*, 279 Ill.App.3d 170, 185, 215 Ill.Dec. 773, 664 N.E.2d 170, 180 (1st Dist.1996) as purported support for Lyke's contention that "[r]easonably equivalent value is determined by reference to the secured creditor's debt, not to the bid price." But the case stands for exactly the opposite principle, instead strongly buttressing Mussetters' opposite position (and this Conclusion 25). In *Voutiritsas* the creditor (who there as here was the only bidder at the sale) bid far less than the $700,000 indebtedness due from its debtor—a "bid of $350,000 … not based on any appraisal, but rather 'pulled out of thin air.'" — to acquire the collateral being sold, a $3 million note (*id.* at 184, 215 Ill.Dec. 773, 664 N.E.2d at 179). And it was the gross insuffi-

v. *Merit Contracting, Inc.*, 99 F.3d 248, 253 n. 2 (7th Cir.1996)), Illinois choice-of-laws principles

clearly look to California's substantive law.

ciency of the *bid amount* (and *not* the total indebtedness) that triggered the court's holding that the sale was indeed commercially unreasonable. That decision finds a direct echo in the facts here, and it calls for the outright rejection of Lyke's argument.[17]

26. It is exceedingly clear, and this Court holds, that Lyke's forgiveness of $750,000 in antecedent debt due to him from HealthTek did not even begin to approach a reasonably equivalent exchange for all of HealthTek's assets. Instead Lyke (and hence Axiom, received the following HealthTek property, which had an aggregate time-of-transfer value of $1.62 million to $1.716 million):

(a) HealthTek's rights under the Xomed License Agreement, which according to Lofvenholm (a disinterested third party for this purpose) had a value of $1 million (P.Ex. 17), and which Lyke himself characterized as having a value of $912,578 (P.Ex. 58, at 000506);

(b) HealthTek's accounts receivable due from Plasco, which Lyke himself valued at $140,000 (*id.*);

(c) HealthTek's other accounts receivable, which according to Lofvenholm had a time-of-transfer liquidation value of $150,000 (P.Ex. 33; Lofvenholm Dep. 228–29);

(d) HealthTek's inventories, which according to Lofvenholm had a time-of-transfer liquidation value of $150,000 (P.Ex. 33);

(e) cash in the amount of $32,744 (D.Ex.54);

(f) office equipment, furniture, fixtures, molds and tools, which according to Lofvenholm had a time-of-transfer liquidation value of $85,540 (P.Ex. 33);

(g) machinery and equipment, which according to Lofvenholm had a time-of-transfer liquidation value of $151,340 (*id.*); and

(h) HealthTek's intellectual property rights to manufacture and market lines of product that had been approved by the Food and Drug Administration (Prime's trial testimony).

27. Even if the measuring stick for reasonably equivalent value were (as it is not) the entire secured indebtedness from Health-Tek to Lyke—that is, even if Lyke had forgiven (as he did not) all of that secured debt—such an exchange would still not have involved reasonably equivalent value. HealthTek's then most recent (and ultimately final) Form 10–Q showed a debt to Lyke in the amount of $1.318 million (P.Ex. 13 at 3), but clearly (a) that figure does not reflect Lyke's prior receipt of the $100,000 payment from Plasco, which this Court concludes was a paydown of secured debt, and (b) at least $110,000 of that debt was unsecured. In that respect the operative security agreement between HealthTek and Lyke (D.Ex.10) contains no future advance provision, and Lyke–Axiom have offered no evidence showing that a $110,000 advance made in January 1991 was in fact a secured transaction (Tr. 128). Thus Lyke and Axiom have also failed to demonstrate that even a forgiveness of all of the secured debt that HealthTek owed to Lyke would have been a reasonably equivalent exchange for all of HealthTek's assets.

*C. UCC–Based Claim*

28. UCC § 9–507 (Cal.Com.Code § 9507) provides in part:

If it is established that the secured party is not proceeding in accordance with the provisions of this chapter disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this chapter.

Because Mussetters as unsecured creditors were not entitled to notice, Lyke Response at 22 correctly asserts that they do not have a damages claim under UCC § 9–507 (distinguishing, in that respect, Mussetters' at-

---

17. As this Court pointed out when Lyke's counsel advanced the same notion at the trial and has been repeated in the text of this Conclusion, a creditor derives a real advantage from a lowball bid: After all, the difference between the bid and the debtor's higher pre-sale indebtedness re-

mains owing to the creditor as a deficiency, while a bid (say) in the full amount of the debt extinguishes it. Mortgagees have that in mind every time they conduct a foreclosure sale (see *Gutierrez* ).

tempted reliance on *Sheffield Progressive,* 405 N.E.2d at 988). But *Sheffield* does confirm (as Lyke acknowledges) that the commercial unreasonableness of a creditor's foreclosure sale gives unsecured creditors (such as Mussetters) a claim under UFCA—and that means under UFTA as well.

29. Case law has developed a number of factors for the trier of fact to consider in determining whether a secured party has acted in a commercially reasonable manner in disposing of collateral. Those factors include (1) whether the sale was public or private, (2) the sale price realized, (3) whether the collateral was sold in bulk or in parcels, (4) the time and place of the sale, (5) whether bids were solicited and received, (6) whether there was sufficient publicity, (7) whether there had been an appraisal, (8) whether the sale had been judicially approved and (9) whether the secured party purchased the collateral (*Crosby v. Reed (In re Crosby)*, 176 B.R. 189, 195–96 (B.A.P. 9th Cir.1994); see generally, Richard Tinney, Annotation, *What Is "Commercially Reasonable" Disposition of Collateral Required by UCC § 9–504(3)*, 7 A.L.R.4th 308 (1981)).

30. Consideration of those factors in the aggregate compels the conclusion that Lyke did not act in a commercially reasonable manner. Conclusion 9 has already determined that the sale was plainly collusive. In real world terms it can hardly be termed a public sale. There was no real publicity—only a legal notice in a local newspaper. Those persons who did show up were given no information whatever about HealthTek's most valuable assets, its accounts receivable and the Xomed License Agreement. There was no appraisal or auctioneer. Indeed, HealthTek's disposition of collateral on only four business days' notice was a violation of the operative security agreement (which required that five business days' notice be given (D.Ex. 10 ¶ 5(A)(3)), and hence a per se failure to act in a UCC-complying commercially reasonable fashion. Due to the application of UCC § 9–501(3)(b) (Cal.Com.Code § 9501(3)(b)), that security agreement set the minimum notice-by-publication requirement as between debtor HealthTek and Lyke. Lyke's failure to adhere to those minimum requirements precludes him from contending that he complied with the UCC (*Ford &*

*Vlahos v. ITT Commercial Fin. Corp.*, 8 Cal.4th 1220, 1233, 36 Cal.Rptr.2d 464, 472, 885 P.2d 877 (1994)). Finally, as the *Voutiritsas* case so ironically invoked by Lyke has said (279 Ill.App.3d at 183–84, 215 Ill.Dec. 773, 664 N.E.2d at 179):

> While price alone does not establish commercial reasonableness, this court has found that price is the *key component* in assessing commercial reasonableness.

As in *Voutiritsas*, the major disparity between Lyke's $750,000 bid and the fair value of the assets that he acquired through that bid clearly calls for a determination that the sale was commercially unreasonable.

### D. Breach of Fiduciary Duty Claim

 31. Under Delaware corporation law a director of an insolvent corporation owes fiduciary duties to the corporation's creditors (*Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 787 (Del.Ch.1992) ("[N]either party seriously disputes that when the insolvency exception [to the general absence of duties beyond contractual terms] does arise, it creates fiduciary duties for directors for the benefit of creditors"); 3 *Fletcher Cyc. Corp.* ("*Fletcher*") § 849, at 234 (1994 rev.) ("The liability in such situations is under a conversion of trust funds theory, and the trust relationship is said to give rise to a fiduciary duty to guard the funds with fidelity and good faith")). For that purpose the director's fiduciary duties arise upon the fact of insolvency, not upon the commencement of insolvency proceedings (*Geyer*, 621 A.2d at 787–90). So when as here the company is insolvent in fact, "[i]t is unlawful for corporate directors to manipulate corporate property so as to pay their own claims against the company to the loss of creditors" (3 *Fletcher* § 849, at 234).

 32. Lyke did not effectively insulate himself from the just-stated principles and standards by his nominal resignation as HealthTek's Board chairman, an action taken in direct contemplation of the already-planned transaction to divest the moribund corporation of its assets a few weeks hence. Under those principles and standards Lyke also breached his fiduciary duties by his conduct. Though any added ground for liability

simply brings further coals to Newcastle, Lyke is liable separate and apart from his liability under UFTA and UCC.

*E. Remedies*

■ 33. UFTA § 8(b) (Cal.Civ.Code § 3439.08(b)) provides in part:

> [T]o the extent that a transfer is voidable in an action by a creditor ... the creditor may recover judgment for the value of the asset transferred ... or the amount necessary to satisfy the creditor's claim, whichever is less.

See generally *Eagle Pacific Ins. Co. v. Christensen Motor Yacht Corp.*, 85 Wash.App. 695, 934 P.2d 715, 720 (1997) (UFTA allows a creditor to recover the full amount of his claim if less than the value of the assets transferred at the time of the transfer). In this instance a money judgment for the full amount of Mussetters' claim is the only effectively available remedy because HealthTek's assets are no longer available for attachment, with its "hard" assets having been scattered around the country for Lyke's and Axiom's benefit and its intangible assets having been largely consumed by Lyke, Axiom and their affiliates (see *Flowers & Sons Dev. Corp. v. Municipal Court*, 150 Cal.Rptr. 555, 559, 86 Cal.App.3d 818, 825 (1978) (construing UFCA and holding that a creditor may recover the amount of his claim when the assets that have been wrongfully transferred are no longer available for attachment)). Mussetters' claim against HealthTek was liquidated by entry of judgment on October 15, 1993 in the principal amount of $311,577.56. That judgment concludes both Lyke and Axiom (see Conclusions 2–4). Because the amount of that claim is less than the value of HealthTek's unencumbered property as of November 30, 1992 (see Conclusions 8, 26–27), this Court determines that Lyke and Axiom are liable to Mussetters for the principal amount of that claim, $311,577.56.

■ 34. Lyke and Axiom are also liable for interest post-judgment in the California Action and prejudgment in this action. Cal. Civ.Code § 3288 provides:

> In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury.

In this bench trial this Court performs the same factfinding function as the jury in a jury trial, rendering that provision applicable here. Cal.Civ.Proc.Code § 685.010 also provides for interest on judgments in the amount of 10% per annum. Because Mussetters' claim against HealthTek was liquidated by entry of the October 15, 1993 judgment in the amount of $311,577.56, this Court determines that their recovery of interest at the judgment rate from that judgment date is appropriate (that remedy places Mussetters in the same position that they would have occupied if the actionable transfers had not occurred).

■ 35. Lyke and Axiom are also liable for exemplary damages.[18] Cal.Civ.Code § 3294(a) provides:

> In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant had been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

Under that section, such exemplary damages are recoverable in an action arising out of a breach of a fiduciary duty (*Heller v. Pillsbury, Madison & Sutro*, 50 Cal.App.4th 1367, 1390, 58 Cal.Rptr.2d 336, 350 (1996); *Sequoia Vacuum Sys. v. Stransky*, 229 Cal. App.2d 281, 289, 40 Cal.Rptr. 203, 208 (1964)). Such exemplary damages are war-

18. Lyke's Response to Mussetters' proposed conclusions urges (citing Rule 9(g)) that such damages are unavailable because they had not been sought in the original Complaint. But Mussetters expressly identified their claim for punitive damages in the parties' joint proposed final pretrial order (FPTO) that this Court entered on August 27, 1997 (more than six months before trial), and Lyke's counsel voiced no objection. Under Seventh Circuit law the FPTO supersedes the pleadings for trial purposes—as *Nagy v. Riblet Prods. Corp.*, 79 F.3d 572, 575 (7th Cir. 1996) has put it:

> By the time the trial begins, pleadings have faded into memory. The document controlling the course of trial is the pretrial order under Fed.R.Civ.P. 16.

Rule 16(e) could not be more plain in that respect, and hence Lyke's objection on that score is rejected.

ranted here, for a judgment that would simply allow these defendants to pay back enough of the assets they wrongfully received as to satisfy plaintiffs' claim (even taking into account the loss of the use of money by the statutory award of interest) "would not be a sufficient deterrent to discourage ... debtors from making fraudulent conveyances to avoid creditors" (*Locafrance United States Corp. v. Interstate Distrib. Servs., Inc.,* 6 Ohio St.3d 198, 451 N.E.2d 1222, 1226 (1983), allowing punitive damages in an UFCA action involving a similar scheme; see also *Shervin v. Liebersohn (In re Shervin)*, 200 B.R. 109, 112 (E.D.Pa.1996), applying Pennsylvania law, and *Golconda Screw, Inc. v. West Bottoms, Ltd.,* 20 Kan. App.2d 1002, 894 P.2d 260, 266 (1995), affirming punitive damages under Kansas law in a fraudulent transfer case: "Such damages may be awarded when appropriate to punish the willful transfer of a judgment debtor's only asset to avoid execution and to deter others from doing so"). Given Lyke's wealth (see his tax returns, P. Exs. 61–63), given the nature of his conduct in breaching his obligations and given his fraudulent concealment of his actions in supplementary proceedings, exemplary damages are appropriate. And the sum of $50,000 in such damages, which takes those factors into account, is not disproportionately large in light of the compensatory damages involved here.

36. Finally Lyke and Axiom are also liable for Mussetters' attorneys' fees, because under California law a judgment creditor is entitled to recover attorneys' fees in enforcing a judgment where (as here) the underlying judgment is based on a contract providing for an attorneys' fee recovery, and where (as here) the underlying judgment contains an attorneys' fee award (Cal.Civ.Proc.Code § 685.040).[19]

\* \* \* \* \* \*

Judgment is ordered to be entered in favor of Mussetters and against Lyke and Axiom, jointly and severally, in the sum of $311,577.56 in principal amount plus $146,181.80 in interest to June 24, 1998 plus $50,000 in exemplary and punitive damages, or a total judgment of $507,759.36. Lyke and Axiom are also ordered to pay Mussetters' reason-

able attorneys' fees, to be established in accordance with Rule 54(d)(2) and this District Court's General Rules 46 and 47—but the pendency of the attorneys' fee matter shall not deprive the judgment provided for in the preceding sentence of finality (see *Budinich v. Becton Dickinson Co.,* 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988)).

---

**19.** What has been said as to punitive damages in n. 18 is equally applicable here (again the FPTO included such a claim by Mussetters). Here too Lyke's objection is rejected.